#24502-a-DG

**2008 SD 61**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,            Plaintiff and Appellee,

  v.

FRANKIE LEE BOWKER,            Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE GLEN A. SEVERSON
Judge

* * * *

LAWRENCE E. LONG
Attorney General

FRANK GEAGHAN
Assistant Attorney General
Pierre, South Dakota            Attorneys for plaintiff
                                        and appellee.

AMANDA M. WILCOXON
Minnehaha County Public
 Defender's Office
Sioux Falls, South Dakota            Attorneys for defendant
                                        and appellant.

* * * *

CONSIDERED ON BRIEFS
ON JANUARY 7, 2008

OPINION FILED **07/09/08**

#24502

GILBERTSON, Chief Justice

[¶1.] On May 10, 2006, Frankie Lee Bowker (Bowker) was indicted by a Minnehaha County grand jury on one count of possession of a controlled substance in violation of SDCL 22-42-5, and one count of possession of drug paraphernalia in violation of SDCL 22-42A-3. Bowker filed motions in the South Dakota Second Judicial Circuit Court to suppress evidence and statements, which were heard on July 25, October 3, and November 21, 2006. The court denied all motions. Thereafter, a jury returned guilty verdicts on both counts. Bowker was sentenced to five years in the South Dakota State Penitentiary for the possession of a controlled substance conviction. That sentence was suspended but for 90 days to be served in the Minnehaha County Jail. Bowker was also sentenced to 30 days in jail for the possession of drug paraphernalia conviction, which was suspended. We affirm.

## FACTS AND PROCEDURE

[¶2.] On May 2, 2006, at around 6:45 a.m., Sioux Falls Police Officer James Buteyn (Buteyn) was pulling into the police station at Fourth Street and Minnesota Avenue in Sioux Falls, South Dakota, as he neared the end of his shift. At that time, Buteyn was flagged down by a passing motorist who reported that a man was on the roof of a nearby house. At about 6:48 a.m., Buteyn called in a possible burglary and proceeded to the subject house. Buteyn was shortly thereafter joined at the residence by Sioux Falls Police Officers Brett Hamlyn (Hamlyn), Jason Leach (Leach) and Allen Phillips (Phillips).

[¶3.] At the house, the officers observed a man in the yard with a Pit Bull. The officers approached and made contact with the man at 6:51 a.m. and observed

-1-

that he had a fresh bleeding cut on his hand. They also observed that a second story window was broken. Buteyn asked the man to identify himself, where he lived and how he cut his hand. The man stated that his name was Shaun Corbine (Corbine) and that he had lived in an apartment inside the house for six months. However, when asked if he carried identification, Corbine produced a driver's license, issued six days earlier, which indicated his address was in Harrisburg. When asked about the discrepancy, Corbine explained that the address on the driver's license was his ex-wife's and that he had not lived there for six months. In reference to the apparent fresh cut, Corbine explained that he had cut his hand the night before when he broke a window after his frightened Pit Bull lunged at him.

[¶4.] Corbine was then asked if anyone was inside the apartment. He indicated that his girlfriend of six months, who had been staying with him, was sleeping inside. Buteyn asked for the girlfriend's name, but Corbine could not initially remember it stating, "I'm drawing a blank." Corbine eventually was able to recall that her name was Frankie Bowker. At the July 25, 2006 suppression hearing, Buteyn testified that due to the broken window; the suspicious answer Corbine gave when he was asked for the name of his girlfriend of six months; his inconsistent statements about his address; and the fresh cut on his hand, the police officers determined that it was necessary for them to enter the premises to conduct a well-being check because Corbine may have been a burglar and a possible assault victim may have been inside.

[¶5.] Corbine did not consent to the officers' entry of the apartment, but produced a key that was used to open the exterior door to the house. Corbine was handcuffed for officer safety and Hamlyn stayed with him while Buteyn, Leach and

Phillips entered the house. At the July 25 hearing, Buteyn testified that the exterior door opened to a ground floor apartment on the left and a stairway straight ahead that led to a second floor apartment. At trial, Buteyn testified that after announcing their presence, he proceeded up the stairs to the second floor apartment followed by Leach and Phillips. Buteyn stated that when he was about three fourths of the way up the stairway, a woman emerged from the apartment, which was on the left, onto the second floor landing.

[¶6.] Buteyn testified that when the woman appeared, her feet were about level with his head. He said that he asked the woman her name and that she identified herself as "Frankie [Bowker]." Buteyn told Bowker to back up into the apartment for officer safety; at which time she stated that the officers could not be on the premises without a warrant. Buteyn again told Bowker to back up into the apartment. Bowker complied and the officers continued ascending to the second floor landing.

[¶7.] After reaching the landing, the officers observed that the doorway opened into a living room with a kitchen area on the left. The officers observed two small children sleeping on the living room floor. To the right of the living room, a doorway opened to a bedroom. At the July 25 hearing, Buteyn testified that from the second floor landing, the officers could see that there was blood on the doorframe leading into the bedroom. Buteyn asked Bowker if she lived in the apartment. At the hearing, Buteyn stated that Bowker said she did not.

[¶8.] Buteyn initially supervised Bowker while Leach and Phillips entered the apartment and swept through the living room and kitchen areas. Phillips then stayed with Bowker for officer safety while Buteyn and Leach entered the bedroom

to continue the well-being check. At the July 25 hearing, Buteyn testified that upon entering the bedroom, three "meth pipes" were in plain view. He stated, "There was a meth pipe laying on the bed. There was a meth pipe laying on a chair and another meth pipe laying on a bed stand." Buteyn noted the time was 7:04 a.m. when the meth pipes were discovered. Buteyn and Leach seized the pipes, which they confirmed contained methamphetamine residue by conducting a field test. Buteyn then called down to Hamlyn to have him place Corbine under arrest.

[¶9.]     At trial, Buteyn testified that he then went back into the living room to speak to Bowker. He stated that Bowker, then aware of the discovery, told him that while she did not live in the apartment, she did stay there a lot. At the October 3, 2006 suppression hearing, Buteyn testified that at this juncture, Bowker was free to leave. After speaking with Bowker, Buteyn then went back outside to talk to Corbine.

[¶10.]     At the October 3 suppression hearing, Leach testified that while Buteyn was outside talking to Corbine, he stayed inside with Bowker and continued speaking to her. Leach asked Bowker how often she stayed at the apartment. Leach stated that Bowker replied that she stayed there four to five nights a week. Leach also testified that he asked Bowker about the meth pipes, and that she said she knew they were in the apartment, but that they were not hers. Leach further testified that following this questioning of Bowker, he did not intend to arrest her.[1]

---

1.     At the October 3, 2006 suppression hearing, Buteyn also testified that he did not have evidence to arrest Bowker at this juncture and that she was free to leave the apartment.

[¶11.]	Buteyn then returned from talking to Corbine and asked Bowker how long it had been since she had stayed somewhere other than the apartment.  At the October 3 hearing, Buteyn testified that in response to this question, Bowker said that she had not stayed anywhere else "for 10 days to two weeks."  At this point, Buteyn placed Bowker under arrest for possession of methamphetamine and drug paraphernalia.  Subsequent to the arrests, police obtained a search warrant for the apartment and found digital scales with methamphetamine residue, jeweler bags for which testimony was later given that they are frequently used for drug storage, documents that law enforcement testified constituted "owe sheets" from drug transactions, telephone records, automobile financing statements and a telephone list with Bowker's name at the top.

[¶12.]	At the July 25, 2006 suppression hearing, Bowker argued her motion to suppress the meth pipes and all subsequent evidence on the ground that they had been illegally obtained without a search warrant.  The trial court denied Bowker's motion concluding that exigent circumstances constituting an exception to the warrant requirement existed due to the officers' perceived need to check on the well being of those inside the apartment.

[¶13.]	At the October 3 and November 21, 2006 hearings, Bowker argued that her statements, made before and after the discovery of the meth pipes, should be suppressed because they were illegally obtained without a Miranda warning.  The trial court denied the motion concluding that Miranda warning was not necessary because there was no custodial interrogation, and Bowker's statements were the product of the officers' "general, on-the scene" questioning.  Findings of fact and conclusions of law were entered.  Bowker's trial was conducted on December 7 and

8, 2006. Bowker was found guilty by a jury of possession of methamphetamine and drug paraphernalia.

[¶14.]     Bowker raises four issues on appeal:

1.     Whether the trial court erred by denying Bowker's motion to suppress evidence obtained without a search warrant.

2.     Whether the trial court erred by denying Bowker's motion to suppress statements allegedly made to police while in custody and without a Miranda warning.

3.     Whether an exhibit containing various documents obtained by police from the apartment was relevant to the State's case and properly admitted by the trial court.

4.     Whether the State's remarks in reference to Bowker's request for a warrant were improper, constituting plain error by the trial court in violation of her right to a fair trial.

## ANALYSIS AND DECISION

[¶15.]     **1.     Whether the trial court erred by denying Bowker's motion to suppress evidence obtained without a search warrant.**

[¶16.]     Bowker argues that the trial court should have suppressed the meth pipes seized by police officers during the initial entry upon the premises, and all evidence subsequently obtained from within the apartment after the police obtained a search warrant because it was all acquired as the result of an initial and illegal warrantless entry.

[¶17.]     This Court reviews the denial of a motion to suppress alleging a violation of a constitutionally protected right as a question of law by applying the de novo standard. State v Stanga, 2000 SD 129, ¶8, 617 NW2d 486, 488 (citing Ornelas v. United States, 517 US 690, 699, 116 SCt 1657, 1663, 134 LEd2d 911

(1996); United States v. Khan, 993 F2d 1368, 1375 (9thCir 1993); State v. Hirning, 1999 SD 53, ¶9, 592 NW2d 600, 603). Appeals alleging an illegal warrantless search implicate a defendant's Fourth Amendment rights and are reviewed by this Court de novo. State v. Sweedland, 2006 SD 77, ¶¶12-13, 721 NW2d 409, 412. (citations omitted). However, we apply the clearly erroneous standard to the factual findings below. Id. ¶12 (citations omitted).

[¶18.] Since freedom from intrusion into one's home or dwelling is the overarching interest set out in the Fourth Amendment, there is a heightened expectation of privacy therein. Payton v. New York, 445 US 573, 587, 100 SCt 1371, 1380, 63 LE2d 639 (1980) (citing Dorman v. United States, 435 F2d 385, 389 (CADC 1970)); State v. Meyer, 1998 SD 122, ¶20, 587 NW2d 719, 723 (citations omitted). While this heightened expectation of privacy generally demands that law enforcement obtain a warrant prior to entering a home or dwelling, "the ultimate touchstone of the Fourth Amendment is 'reasonableness'[, and thus], the warrant requirement is subject to exceptions." Brigham City, Utah v. Stuart, 547 US 398, 403, 126 SCt 1943, 1947, 164 LEd2d 650 (2006) (citing Flippo v. West Virginia, 528 US 11, 13, 120 SCt 7, 145 LEd2d 16 (1999) (per curiam); Katz v. United States, 389 US 347, 357, 88 SCt 507, 19 LEd2d 576 (1967)). One such exception is exigent circumstances. Id. (citing Mincey v. Arizona, 437 US 385, 393-394, 98 SCt 2408, 57 LEd2d 290 (1978)); Meyer, 1998 SD 122, ¶20, 587 NW2d at 723 (citations omitted). The State has the burden to prove that an exigency justifying warrantless entry exists. State v. Hess, 2004 SD 60, ¶23, 680 NW2d 314, 324 (citations omitted).

[¶19.]    "Exigent circumstances exist when 'a situation demand[s] immediate attention with no time to obtain a warrant.'" State v. Dillon, 2007 SD 77, ¶18, 738 NW2d 57, 60 (quoting *Hess*, 2004 SD 60, ¶24, 680 NW2d at 325); *Meyer*, 1998 SD 122, ¶23, 587 NW2d at 724 (citing State v. Heumiller, 317 NW2d 126, 129 (SD 1982))).  The need to protect or preserve life or avoid serious injury presents that kind of situation.  *Dillon*, 2007 SD 77, ¶20, 738 NW2d at 61(citations omitted).

[¶20.]    Whether exigency justifying warrantless entry exists is "applied to the facts as perceived by the police at the time of entry[.]"  *Meyer*, 1998 SD 122, ¶23, 587 NW2d at 724 (citing *Heumiller*, 317 NW2d at 129).  "[A]nalysis of whether this exception to the warrant requirement has been made out is an objective one centering on what a reasonable, experienced law enforcement officer would have believed."  *Hess*, 2004 SD 60, ¶25, 680 NW2d at 325 (citing United States v. Clement, 854 F2d 1116, 1119 (8thCir 1988)).  We have recognized that a law enforcement officer's subjective justification is not determinative to this analysis.  State v. Lamont, 2001 SD 92, ¶21, 631 NW2d 603, 610.  Still, there was until recently a split view on this issue.  *Brigham City*, 547 US at 402, 126 SCt at 1947, 164 LEd2d 650 (citations omitted).  In *Brigham City*, the United States Supreme Court settled the issue, reiterating that "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively,* justify [the] action.'"  *Id*. at 404, 126 SCt at 1948, 164 LEd2d 650 (citing Scott v. United States, 436 US 128, 138, 98 SCt 1717, 56 LEd2d 168 (1978)) (emphasis and alteration original).

[¶21.]     In regard to Bowker's motion to suppress evidence, the trial court found that after Buteyn was alerted to a possible burglary in progress, he and the other officers encountered Corbine at the subject residence. Corbine had a fresh cut and blood on his hands and clothing. The trial court also found that although Corbine claimed to live in an apartment inside the house, he nevertheless produced a driver's license indicating that he lived in Harrisburg; that Corbine told the officers that his girlfriend was upstairs; and that although he had been seeing her for six months, he was unable, initially, to identify her by name. The court found that after entering the house, Buteyn, Leach and Phillips were proceeding up the stairway to the second floor apartment when they encountered Bowker; that her feet were about level with Buteyn's head at that point; that the officers could not see into the apartment until they had reached the second floor landing; and that thereafter, they observed blood on the door frame leading into the bedroom. *See Lamont*, 2001 SD 92, ¶32, 631 NW2d at 614 (opining in a warrantless entry case that the presence of blood is a strong indicator of injury therein further justifying the warrantless entry).

[¶22.]     There is evidentiary support for the trial court's findings in this case and its determination that objectively speaking these police officers were concerned that a burglary may have taken place and that assault victims may have been in need of medical attention inside the apartment. Based on these findings, we conclude that the police officers were objectively justified in entering the house and apartment in order to check on the well-being of persons inside.

[¶23.]     Bowker argues that the fact Corbine was able to produce a key to the apartment negates any concern that he was at the house for an illegal purpose, which would justify a well-being check and that the officers entered the apartment with the intent of obtaining evidence sufficient to charge Corbine with a crime. However, we consider reasonable Buteyn's testimony at the October 25, 2006 hearing, where he stated that he had no way of knowing whether Corbine had come by the key legitimately or whether he had picked it up inside the apartment during a burglary.  For all the foregoing reasons we affirm the trial court on this issue.

[¶24.]     **2.     Whether the trial court erred by denying Bowker's motion to suppress statements allegedly made to police while in custody and without a Miranda warning.**

[¶25.]     Bowker argues that her statements made inside the house prior to her arrest were produced through custodial interrogation without a Miranda warning; thus violating her Fifth Amendment right against self-incrimination.  Bowker thereby contends that the trial court should have granted her motion to suppress the statements.

[¶26.]     The Fifth Amendment right against self-incrimination is implicated whenever an individual is subject to custodial interrogation by law enforcement. State v. Rhines, 1996 SD 55, ¶11, 548 NW2d 415, 426 (citing Miranda v. Arizona, 384 US 436, 478, 86 SCt 1602, 1630, 16 LEd2d 694 (1966)).  "Miranda warnings are called for when a person is being interrogated 'in custody at the station or otherwise deprived of his freedom of action in any significant way.'"  State v. Hamm, 89 SD 507, 234 NW2d 60, 64 (1975) (quoting *Miranda,* 384 US at 477, 86 SCt at 1629, 16 LEd2d 694).  The subjective views of the interrogating officer and the person being

questioned do not enter into this analysis. State v. Thompson, 1997 SD 15, ¶25, 560 NW2d 535, 540 (quoting Stansbury v. California, 511 US 318, 323, 114 SCt 1526, 1529, 128 LE2d 293 (1994)). "Whether an individual is in custody is determined by 'how a reasonable man in the suspect's position would have understood his situation.'" State v. Hoadley, 2002 SD 109, ¶24, 651 NW2d 249, 256 (quoting State v. Anderson, 2000 SD 45, ¶79, 608 NW2d 644, 666 (quoting State v. Herting, 2000 SD 12, ¶13, 604 NW2d 863, 866)).

[¶27.]      In setting out our standard of review for appeals alleging custodial interrogation without a Miranda warning implicating a defendant's Fifth Amendment rights against self-incrimination, we follow a well-established test that involves "two discrete inquiries" requiring the application of two standards. Thompson v. Keohane, 516 US 99, 112-13, 116 SCt 457, 465, 133 LEd2d 383 (1995); *see also* State v. Morato, 2000 SD 149, ¶11, 619 NW2d 655, 659 (observing that two standards apply when reviewing cases where involuntary confession is alleged) (citations omitted). "The first inquiry" applies to "the circumstances surrounding the interrogation;" *i.e.* the *scene and action,* which is factual, thereby "attract[ing] a presumption of correctness" to the trial court's findings. *Thompson,* 516 US at 112, 116 SCt at 465, 133 LEd2d 383; *see also Morato,* 2000 SD 149, ¶11, 619 NW2d at 659 (citations omitted). We have also referred to this as involving factual determinations that are reviewed under the clearly erroneous standard. State v. Aesoph, 2002 SD 71, ¶12, 647 NW2d 743, 750 (citing *Meyer,* 1998 SD 122, ¶16, 587 NW2d at 722-23). However, the application of those facts to the determination of whether a reasonable person under those circumstances would consider themselves

to be in custody is a question of law. *Thompson*, 516 US at 112, 116 SCt at 465, 133 LEd2d 383; *see also Morato*, 2000 SD 149, ¶17, 619 NW2d at 661; *Aesoph,* 2002 SD 71, ¶12, 647 NW2d at 750. "The ultimate determination, [therefore], presents a 'mixed question of law and fact' qualifying for independent review." *Thompson*, 516 US at 112-13, 116 SCt at 465, 133 LEd2d 383; *see also Morato*, 2000 SD 149, ¶17, 619 NW2d at 661; *Aesoph* 2002 SD 71, ¶12, 647 NW2d at 750.

[¶28.]    From the time that Buteyn, Leach and Phillips entered the apartment, Bowker was under continuous supervision. Buteyn supervised Bowker while Leach and Phillips conducted the initial sweep of the living room area. Phillips then supervised Bowker when Buteyn and Leach checked the bedroom. The officers' testimony, reflected in the trial court's findings, indicates that at no time until she was arrested was Bowker formally restrained.[2] Nevertheless, Phillip's testimony indicates that she was placed on a couch and was not free to move about the apartment while Buteyn and Leach checked the bedroom.

[¶29.]    After the plain-view discovery of the meth pipes, Bowker was asked about the pipes and how often she stayed in the apartment. The testimony of Buteyn and Leach at the October 3, 2006 hearing, which is reflected in the trial

---

2.    The dissent suggests that there was no reason for the police officers to have entered the bedroom to continue the well-being check because "[w]ithin the first few seconds after entering the apartment," they were able to ascertain that "no one in the apartment was injured or in danger." However, the dissent overlooks the suppression hearing testimony of officers Buteyn and Leach who stated that from their vantage point just inside the doorway of the apartment, they observed blood on the bedroom door frame and that they entered the bedroom to determine whether someone was injured or concealed therein.

court's findings, indicates that they had no intention of arresting Bowker and that she was free to leave the apartment with her children, even after she acknowledged having stayed in the apartment four to five nights a week and having seen the meth pipes before. However, the officers' testimony in this regard is not determinative to our analysis. *See Stansbury*, 511 US at 323, 114 SCt at 1529, 128 LE2d 293 (reiterating that an interrogating officer's subjective view is irrelevant to the custody analysis).

[¶30.] The officers were in the process of determining what was going on in the premises, who was involved in it, and whether anyone was in need of emergency assistance. It was not unreasonable, while this process was going on, to have Bowker remain on the couch. This was for her safety, the safety of others in the apartment and the officers. A right to move about the apartment is not synonymous with a constitutional right to leave it. Bowker cites to no authority that she had the right to move about the apartment during this brief process.[3]

---

3. The dissent cites excerpts from Phillips's testimony at the November 21, 2006 continuation of the second suppression hearing, in order to suggest that Bowker was not free to "walk around" the apartment let alone leave. The dissent claims that following the discovery of the meth pipes there was a point during which Buteyn and Leach left Phillips alone with Bowker while they went downstairs to talk to Corbin. We acknowledge that Phillips testified that he was *alone* with Bowker at some point. However, he also testified that during the period in which he was *alone* with her, he was at the same time "*in the living room for security reasons*" and that he was locating himself in a "*security position*[.]" (Emphasis added). We conclude that the fact finder at the suppression hearing could reasonably have determined that Phillips's reference to being alone with Bowker and restricting her movements in the apartment was in the context of his supervising her for officer safety while Buteyn and Leach were conducting the well-being check inside the bedroom, since under no other circumstances would Phillips have been present for "security reasons." Furthermore, a review of the October 3

(continued . . .)

[¶31.] Moreover, the officers' questions were "general, on-the-scene" questions, not subject to Miranda. A law enforcement officer is not required to deliver a Miranda warning when his questions constitute "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process. . . ." State v. Bartunek, 323 NW2d 121, 124 (SD 1982) (quoting Miranda, 384 US at 477, 86 SCt at 1629, 16 LEd2d 725). In Bartunek, a sheriff's deputy responding to an auto accident encountered the defendant and his brother wandering around the accident scene. Id. at 122. The deputy asked the brothers several questions including the extent of their injuries, whether they needed medical attention, and who was driving the car. After the brothers admitted that the defendant brother had been driving, the defendant brother was arrested and charged with driving while intoxicated. Id. at 122-23. On appeal of his conviction, the defendant argued that he was entitled to a Miranda warning at the time the responding deputy asked the identity of the driver. Id. at 123. On the strength of SDCL 32-34-4, which requires the driver of any vehicle involved in an accident to contact law enforcement without delay and identify themselves, we

_____

(. . . continued)

testimony of Buteyn and Leach, reveals that while Buteyn went downstairs to talk to Corbine following the discovery of the meth pipes, Leach remained behind in the apartment with Phillips and Bowker. Notwithstanding, evidence contrary to the dissent's claim that Phillips remained alone with Bowker and continued to restrict her movements following the discovery of the meth pipes, both Buteyn and Leach testified at the October 3 hearing, that Bowker was free to gather her children and leave the apartment up until the point at which she told Buteyn that she had stayed nowhere else for 10 to 14 days. See supra ¶¶9-11.

affirmed the defendant's conviction, holding that the deputy was conducting "general, on-the-scene questioning." *Id.* at 125.

[¶32.]     It is also instructive to review the facts in *State v. Myhre*, 2001 SD 109, 633 NW2d 186. In *Myhre*, a wildlife conservation officer with the South Dakota Department of Game Fish and Parks (GF&P) happened upon a party of three hunters whom, after an initial questioning, he suspected had committed an infraction. *Id.* ¶¶2, 3. The officer left the scene to search the nearby roadway for evidence that would corroborate his suspicions. *Id.* ¶3. Finding none, he left the scene, but happened upon a second group of hunters nearby whom he questioned about the first group. *Id.* ¶4. The second group of hunters renewed the officer's suspicions about the first. He then returned to the first group to continue questioning. *Id.* ¶5.

[¶33.]     The officer questioned each of the three hunters individually. *Id.* ¶¶6, 7. He elicited a confession from the first hunter and then instructed him to remain seated on the tailgate of the GF&P pickup. *Id.* ¶6. Next, the officer instructed the second hunter to get into the GF&P pickup, where he elicited a corroborating confession. After instructing the second hunter to remain in the pickup, he went to the hunters' adjacent vehicle and climbed inside with the defendant. *Id.* ¶¶6, 7. After the officer confronted the defendant with specific allegations of a game infraction, the defendant confessed to his role for which he was subsequently cited. *Id.* ¶¶7, 8. The officer did not administer a Miranda warning prior to this questioning. *Id.* ¶7.

[¶34.] In *Myhre*, we concluded that the officer's questioning of the defendant was more than conversational, went beyond "general on-the-scene" fact gathering, and was intended to elicit a confession. *Id.* ¶¶20, 21. In arriving at this conclusion, we noted that the officer had ordered the defendant to remain in his vehicle while he conducted separate interrogations of the other two hunters. *Id.* ¶20. Armed with their confessions implicating the defendant, the officer confronted the defendant with allegations of the game infraction. *Id.* Despite the defendant's repeated attempts to avoid the officer's questioning, the officer persisted in his attempts to obtain the defendant's confession and at no time informed the defendant that he could leave or that he did not have to answer the questions. We held that that interrogation, which yielded the defendant's confession, was custodial in nature. *Id.*

[¶35.] Juxtaposed with the facts of *Bartunek* and *Myhre*, we agree with the trial court that Buteyn's initial question to Bowker when he encountered her while coming up the stairs – *i.e.* whether she lived in the apartment – can be construed as a "general on-the-scene" question in furtherance of the fact-finding process. Leach's and Buteyn's subsequent questions to her about how often and how long she had stayed in the apartment can be similarly construed. The nature of the questioning and the environment in which the questions were asked is in no way similar to the rigorous confined confrontation of the defendant in *Myhre*. In the instant case, the officers were simply trying to ascertain Bowker's status concerning the apartment that they were searching on an emergency basis. A reasonable person in Bowker's situation would not have considered herself in custody at that time. While for

officer safety she may not have been free to roam around the apartment at will, she

was nevertheless free to leave up to the point of her arrest.[4]

[¶36.] **3. Whether an exhibit containing various documents obtained by police from the apartment was relevant to the State's case and properly admitted by the trial court.**

---

4. The dissent relies in large part upon what it claims can be heard on the audio portions of a videotape that recorded police conversations made while the well-being check was on-going. There were two motions to suppress. The first, heard on July 25, 2006, was to suppress drug paraphernalia and other evidence of drug use and distribution found at the apartment. The tape was introduced at this hearing as an exhibit and is referenced in the transcript. The trial court denied the motion to suppress evidence.

Bowker then filed a second motion to suppress statements she made in the apartment. At the opening of the second hearing, the State asked the trial court to incorporate the *testimony* from the first suppression hearing, but did not ask for any exhibits to be incorporated. In denying Bowker's second motion to suppress, the trial court found that Bowker was free to leave during the questioning and that she answered the questions voluntarily. *At no time during this suppression hearing did defense counsel ask for the tape to be introduced or incorporated.* We also observe that in objecting to the trial court's findings, Bowker did not cite to the tape. Nor does Bowker cite to the tape on appeal for support of her argument pertaining to the Miranda issue. Thus, while the dissent bases its argument chiefly on this tape, throughout the trial and appellate proceedings, it played no part in the issue of whether Bowker was free to leave or whether she was restrained at the time she made the statements that she sought to suppress.

Since Bowker failed to introduce the tape at the hearing on the motion to suppress statements or have it incorporated into those proceedings, any consideration of the content of the tape is waived on appeal. *See* Berdahl v. Gillis, 136 NW2d 633, 635 (SD 1965) (holding that a letter utilized by the appellant in his argument would not be considered on appeal because it was not properly before the trial court). As an appellate court, we are confined to the record and issues presented to us for judicial review. *See* DeMarco v. Jones & Laughlin Steel Corp., 522 A2d 26, 28-29 (Pa 1987) (opining that appellate court consideration of matters not raised by trial counsel result in the trial becoming "merely a dress rehearsal")

[¶37.]    Prior to trial, Bowker filed a motion in limine seeking an order to prevent the State or its witnesses from making any reference to various documents, later entered as State's Exhibit 17, and specifically, a phone list contained therein with the words "Frankie's Pimp Lists" printed at the top. Bowker asserted that the documents were inadmissible, pursuant to SDCL 19-12-2 (Rule 402), because they were irrelevant to the charges pending against her; they were inadmissible, pursuant to SDCL 19-12-3 (Rule 403), because any probative value they might have was substantially outweighed by their prejudicial effect; and they constituted inadmissible character evidence, pursuant to SDCL 19-12-5 (Rule 404(b)).

[¶38.]    A trial court's evidentiary rulings are presumed to be correct. State v. Crawford, 2007 SD 20, ¶13, 729 NW2d 346, 349 (citation omitted). On appeal, we review evidentiary rulings for abuse of discretion. State v. Asmussen, 2006 SD 37, ¶13, 713 NW2d 580, 586 (citations omitted). "An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." *Id.* (quoting State v. Henry, 1996 SD 108, ¶10, 554 NW2d 472, 473 (citations omitted)).

[¶39.]    "All relevant evidence is admissible[.]" SDCL 19-12-2 (Rule 402). Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." SDCL 19-12-1 (Rule 401). "The law favors admitting relevant evidence no matter how slight its probative value." State v. Bunger, 2001 SD 116, ¶11, 633 NW2d 606, 609. "It is sufficient that the evidence has a tendency to make a consequential fact *even the*

*least bit* more probable or less probable that [sic] it would be without the evidence."

*Id*. (citation omitted) (emphasis original). However, "relevant [ ] evidence may be

excluded if its probative value is substantially outweighed by the danger of unfair

prejudice." SDCL 19-2-3.

[¶40.]        In addition to the phone list, Exhibit 17 contained Corbine's vehicle

financing statements and cell phone records. The exhibit also contained the "owe

sheets" with coded language.[5] The State argued that the vehicle financing

statements and cell phone records were relevant to the charges against Bowker

because they connected her boyfriend Corbine to the residence and that the "owe

sheets" evinced drug transaction activity.[6] Although Bowker alleged that the State

sought to introduce the phone list entitled, "Frankie's Pimp Lists" in order to

impugn her character, the State asserted that the sizable phone list had "probative

value to establish that [Bowker] was present [at the apartment], lived there,

apparently felt that she was there, put enough portion of the time of her life to

bring with her and leave there a list of phone numbers that had some importance to

her." Moreover, the State argued that the phone list was "probative and admissible

---

5.     Dollar computations, names and various terms such as "booties," "T-shirts"
       and "games" were found on the "owe sheets." At the trial, a Sioux Falls
       Police Department Detective, John Duprey (Duprey), testified that the term
       "bootie" is equivalent to the term "8-ball," which is code for an eighth of an
       ounce of methamphetamine. Duprey stated that the term "T-shirt" is
       equivalent to the term "teener," which is code for a sixteenth of an ounce and
       that the term "game" is code for an ounce of methamphetamine.

6.     The "owe sheets" may have additional relevance since testimony was offered
       that Corbine had not drawn up the sheets and that all but one of the sheets
       was, in the opinion of Duprey, "in female handwriting."

to show [Bowker's] access and joint possession of the premises which is part of what the State needs to prove and persuade the jury about in this case."

[¶41.]    Evidence is unduly prejudicial if it persuades the jury in an unfair or illegitimate manner, but not merely because it harms the other party's case. State v. Mattson, 2005 SD 71, ¶20, 698 NW2d 538, 546 (citations omitted). The party objecting to the admission of evidence has the burden of establishing that the probative value of said evidence is substantially outweighed by its prejudicial effect. *Id.*

[¶42.]    In this case, the State laid a foundation for the relevancy and probative value of the documents that were entered into evidence as Exhibit 17. In contrast, Bowker has failed to show in what manner she was unduly prejudiced by the admission of these documents. Therefore, we find no abuse of discretion in the trial court's refusal to grant an order to prevent the State or its witnesses from making reference to the documents.

[¶43.]    **4.    Whether the State's remarks in reference to Bowker's request for a warrant were improper, constituting plain error by the trial court in violation of her right to a fair trial.**

[¶44.]    Bowker argues that the State made comments during closing argument that violated her right to a fair trial when it referenced her request for a warrant when Buteyn, Leach and Phillips were climbing the stairs to the apartment. In that regard the State said,

> There is only one reason why a person would say that. That's if they had guilty knowledge of what was within. They have a desire to protect the drug paraphernalia and substances that are within. They know about them. They are exercising dominion and control them by preventing the police from seeing them.

The State went on to say, "That's what a drug user would say to a police officer. That's not what a normal innocent citizen would say to a police officer." Since Bowker failed to object to the State's remarks at that time, she now raises the issue on appeal claiming plain error.

[¶45.]     Where an issue has not been preserved by objection at trial, our review is limited to whether the trial court committed plain error. State v. Buchhold, 2007 SD 15, ¶17, 727 NW2d 816, 821 (citations omitted). "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of a court." State v. Nelson, 1998 SD 124, ¶7, 587 NW2d 439, 443 (citing SDCL 23A-44-15 (Rule 52(b))).

[¶46.]     "We invoke our discretion under the plain error rule cautiously and only in 'exceptional circumstances.'" State v. Robinson, 1999 SD 141, ¶17, 602 NW2d 730, 735 (quoting Nelson, 1998 SD 124, ¶8, 587 NW2d at 443). "Plain error requires (1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" Id. (quoting Nelson, 1998 SD 124, ¶8, 587 NW2d at 443) (alteration original). When plain error is alleged, the defendant bears the burden of showing the error was prejudicial. Nelson, 1998 SD 124, ¶7, 587 NW2d at 443 (citations omitted).

[¶47.]     Bowker cites United States v. Moreno, 233 F3d 937 (7thCir 2000) and United States v. Thame, 846 F2d 200 (3dCir 1988) as a basis for reversal of her conviction. However, these cases do not aid Bowker's argument on this issue, and if anything, lend support for affirmance. The defendant in Moreno alleged that

testimony by a government witness pertaining to an initial consent to warrantless search and subsequent revocation of that consent was improperly allowed. 233 F3d at 940. The court observed that the government may not refer to a defendant's post-arrest silence or invocation of Fifth Amendment privilege, *id*. at 941 (citing Doyle v. Ohio, 426 US 610, 96 SCt 2240, 49 LEd2d 91 (1976); Griffin v. California, 380 US 609, 85 SCt 1229, 14 LEd2d 106 (1965)), and that the rule is extended by many jurisdictions to implicate the Fourth Amendment arising from a defendant's refusal to grant warrantless entry. *Id*. However, the court considered this proposition *arguendo* in order to affirm the judgment below on the strength of harmless error based on the overwhelming evidence pointing toward the defendant's guilt. *Id.*

[¶48.] *Thame,* like the instant case, raises an issue of plain error based on statements made by the government during closing argument in regard to the defendant's refusal to submit to a warrantless search of a baggage item. 846 F2d at 204. While the court decided that the holding in *Griffin* should be extended to the Fourth Amendment, *id*. at 207, it affirmed the judgment concluding that since there was overwhelming evidence pointing towards guilt, the government's remarks had no impact on the jury deliberations. *Id*. at 207-08.

[¶49.] With respect to the instant case, while we do not condone the kind of prosecutorial conduct evinced by these remarks, we conclude that given the overwhelming evidentiary support for the jury's verdict, Bowker has not satisfied her burden of showing plain error, affecting a substantial right that seriously

affected the fairness or integrity of her trial or the public reputation of judicial proceedings in general.

[¶50.] For all the foregoing reasons, we affirm.

[¶51.] SABERS and KONENKAMP, Justices, concur.

[¶52.] ZINTER, Justice, concurs with a writing.

[¶53.] MEIERHENRY, Justice, dissents.

ZINTER, Justice (concurring).

[¶54.] I concur, except that with respect to Issue 2, the questioning went beyond general on-the-scene questioning. Nevertheless, the trial court's findings of historical fact regarding Bowker's custodial status were not clearly erroneous, and the trial court did not err in concluding that suppression was not required.

MEIERHENRY, Justice (dissenting).

[¶55.] I dissent on issue two and would reverse the trial court's denial of Bowker's motion to suppress. I agree with the majority that "Buteyn's initial question to Bowker when he encountered her while coming up the stairs – *i.e.* whether she lived in the apartment – can be construed as a 'general on-the-scene' question in furtherance of the fact-finding process." *Supra* ¶35. However, I disagree that Leach's and Buteyn's subsequent questions to her "can be similarly construed." *Id.* The audio from the videotape of the alleged well-being check[7] along

---

7. Although the majority says that the videotape was not offered into evidence for the *second* suppression hearing and should not be considered, the videotape actually was part of the entire record that the court clearly considered for both the original motion to suppress evidence and the second motion to suppress

(continued . . .)

with the testimony of the officers, establish that Bowker was in custody and interrogated without first being made aware of her *Miranda* rights.

[¶56.] A review of the record supports Bowker's claim that a reasonable person in her situation would have considered herself in custody. Before the officers entered the apartment, Bowker identified herself and protested that the police could not enter the apartment without a warrant. The officers ordered her to step back and not to move about while they entered to look around. Before inquiring as to her well-being, one of the officers asked her, "Why is Shaun out on the roof?" and, "What's up with the broken glass out there?" Bowker immediately

---

(. . . continued)

    statements. The denial of both the suppression of evidence and statements were drafted together on a single order, which stated:

> the [c]ourt having heard and considered the evidence and arguments of the parties together with the files and the records herein and having made and entered Findings of Fact and Conclusions of Law; now, therefore IT IS HEREBY ORDERED that Defendant's Motion to Suppress Re; Search of Residence and Motion to Suppress Statements be and the same here are denied.

    Both denials utilized the same findings of fact and conclusions of law. Additionally, Bowker questioned a witness about the videotape and argued portions of it in the second hearing. No objections were made by the State. Clearly, the videotape was before the court and considered when the order was entered. Consequently, this Court must consider the same evidence for this de novo review.

    The audio of the officers' discussion (apparently between Buteyn to another officer) regarding whether they had enough information to enter the apartment progressed as follows: "I mean the cut [on Corbine's finger] is old; but, these guys just said he was up [on the roof]. And [Corbine] said he was up there cleaning the glass up." This exchange suggests that the officers knew the wound on Corbine's finger was old at the time of the well-being check, not "fresh" as the trial court and the majority opinion described it. Moreover, the audio also reveals the officers discussing whether or not to arrest Corbine. They settled on cuffing him and checking out the apartment before arresting him.

identified herself to the officers and told them she lived in the apartment with Shaun (Corbine). Within the first few seconds after entering the apartment, the officers had Bowker's name, had corroborated Corbine's story about living in the residence and had established that no one in the apartment was injured or in danger. Nevertheless, the officers still restrained Bowker's movement. Officer Phillips testified that Bowker would not have been permitted to "walk around," even after the well-being check. One of the officers ordered her not "to get crabby and reach for something." To which she immediately replied, "I am not going to do nothing crazy. Fuck! Fuck!" Consequently, Bowker remained seated on the couch in the snug 8' by 12' living room during the entire time the officers were in the apartment. Officer Phillips supervised her at all times.

[¶57.]    Officer Phillips explained his role in securing Bowker's movements and that she was not free to move about even after the "well-being" check. He described the situation as follows:

> A:    . . . They [Officers Leach and Buteyn] would go downstairs and talk to a male individual. I would just basically stand in the living room [watching Bowker] for security reasons.
>
>                          ***
>
> Q:    And were other officers [Officers Leach and Buteyn] down there with Mr. Corbine?
> A:    At the bottom of the stairs outside, they were.
> Q:    So you were basically just there in a security capacity?
> A:    Yes.
>
>                          ***
>
> Q:    And in that capacity would you have let somebody, say walk around?

A:     No.[8]

[¶58.]     After the officers found the meth pipes in the adjoining bedroom and after they arrested Corbine, their attention turned to Bowker. Officer Leach, with the meth pipes in his hands, then began to question Bowker. Leach explained to her that the meth pipes were in plain view on the bed, chair and bedstand. He

---

8.     The majority states that the fact finder "could reasonably have determined that Phillips's reference to being alone with Bowker and restricting her movements in the apartment was in the context of his supervising her for officer safety while Buteyn and Leach were conducting the well-being check inside the bedroom, since under no other circumstances would Phillips have been present for 'security reasons.'" *Supra* ¶30 n3. Although I agree that Phillips claimed his sole purpose for supervising Bowker was for "security reasons," I strongly disagree that the fact finder could reasonably fabricate a sequence of facts contrary to those argued or presented. Phillips unequivocally testified to the following:

> State (cross-examination): Officer Phillips, do you have a clear distinct recollection of being alone with Ms. Bowker in that apartment –
> Phillips: Yes.
> State: At the time when both Officer Leach and Officer Buteyn were downstairs and outside talking to Mr. Corbine?
> Phillips: Yes.

It is not reasonable for the trial court, nor the majority, to independently concoct a factual situation that contradicts the plain facts of this case without substantiating a reason for the contrary finding.

Although the majority claims that the dissent relies chiefly on the videotape for this writing, the officers' testimonies, such as the quoted portion above, are the foundation for this special writing. Indeed, the video recorded only a small fraction of the interrogation and captured no useful picture evidence. It is only useful to recreate a truthful tone of the officers' entry into the apartment and the following few minutes inside, prior to the custodial interrogation. With regard to the custodial interrogation analysis, the testimony is where the substantive analysis begins.

wanted to know if the pipes belonged to her, if she slept in the bedroom and if she knew that the pipes were in the bedroom.[9]  He testified as follows:

> A.  I asked her, it would have been before, when I was upstairs originally, I did ask her, I told her I found three pipes in the bedroom.  I showed her the pipes.  I asked her if they were hers.  She stated they were not hers but she had seen them before.
> Q.  Seen them before, correct?
> A.  Correct.

Officer Leach testified that he also asked her questions about the living arrangements in the apartment as follows:

> I did talk with Ms. Bowker.  I asked her first of all her name. She stated her name was Frankie Bowker.  Also asked her if she lived at this apartment.  She stated she did not.  Gave me an address on East 20th Street.  She said that was where she lived. I did ask Ms. Bowker how often she does stay at the apartment here.  She stated to me she stayed in the apartment four to five nights a week.  I asked her if her children stayed with her.  She stated when her children stay with her, she does stay out in the living room with them.  I then asked her if she occasionally stays in the bedroom.  She stated when her children were not with her, she does sleep in the bedroom.

While the officers questioned her, one can hear the officers on the audio actually having a discussion, apparently in front of her, about arresting her.

[¶59.]      To determine if Bowker was in custody, we have to apply the test of "whether, under the totality of the circumstances, a reasonable person would not

---

9.  During the "well-being" investigation, the audio from the officers' on-person microphone cut off at two different times for a substantial period.  The first audio void occurred immediately after the officers determined they would arrest Corbine.  The second large chunk of missing audio corresponds with the complained-of questioning.  Therefore, the only rendition of the officers' questioning of Bowker is reconstructed from the officers' testimony at the suppression hearing and trial.

believe [herself] free to go." State v. Corder, 460 NW2d 733, 736 (SD 1990) (citing Terry v. State of Ohio, 392 US 1, 88 SCt 1868, 20 LEd2d 889 (1968)). We have said that to distinguish between custodial and non-custodial interrogations it is important to analyze the "nature of the interrogator; nature of the suspect; time and place of the interrogation; nature of the interrogation; and purpose of the investigation." State v. Bartunek, 323 NW2d 121, 124-25 (SD 1982) (citation omitted).

[¶60.]      Here, an analysis of the circumstances indicates that most of the questioning was in a custodial setting and that a reasonable person would not have believed she was free to go. Bowker first encountered the officers prior to 7:00 a.m., when the officers demanded entry into the residence without consent or a warrant.[10] Barging into the residence, the officers never explained to Bowker the

---

10.    Both Officers Buteyn and Leach testified at the hearings and the trial that as they initially ascended the stairs to the apartment, Bowker appeared at the top landing and asked if they had a search warrant. The prosecutor used her question about the search warrant in his closing argument as follows:

> There is only one reason why a person would say that. That's if they had guilty knowledge of what was within. They have a desire to protect the drug paraphernalia and substances that are within. They know about them. They are exercising dominion and control over them by preventing the police from seeing them.
>
> I don't think you can't be here without a search warrant would be the first thing that would come out of anybody else's mouth. You might say what are you doing. You might say what's going on. You might say has something happened to my child or my folks. You might say all kinds of things but unless you have a reason or unless you are a constitutionalist, a constitutional scholar and you have no evidence to believe she is, the first thing out of your mouth is not going to be you can't be here without a search warrant. That's what a drug user would
>
>                                              (continued . . .)

purpose for the abrupt invasion.  The officers ordered Bowker to step back and not move.  Once back in the apartment, the officers ordered her to sit on the couch and "not to get crabby and reach for something."  The officers continuously supervised her while they searched the apartment.  During this entire time, she was not free to move around or leave.  She observed the officers discover drug paraphernalia from Corbine's bedroom.  After this discovery, one of the officers yelled out the window to a fourth officer on the ground to arrest Corbine.  At this time, the officers split up; Buteyn went downstairs to interrogate Corbine while Leach remained upstairs to interrogate Bowker.  Phillips remained in the living room with Leach and Bowker for "security purposes."  With the drug paraphernalia held in front of Bowker, Leach interrogated Bowker about her knowledge and possible ownership of the drug paraphernalia.  After a substantial amount of interrogation, Leach left Bowker, with Phillips still "supervising" her, and went downstairs to question Corbine and confer with Buteyn.  Buteyn then returned to the apartment to interrogate Bowker further, at which point she was eventually arrested.

[¶61.]     The questioning went beyond mere on-the-scene questioning or inquiry into her well-being.  The questioning occurred substantially after the officers were aware that no one in the apartment was in danger or injured.  Moreover, the interrogation happened after the officers had arrested Corbine.  The officers remained in the apartment without consent "supervising" and questioning Bowker

---

(. . . continued)
> say to a police officer.  That's not what a normal innocent citizen
> would say to a police officer under those circumstances.

The defense made no objection.

about her sleeping habits, residence, woman's clothing and toys found near the drug paraphernalia and the drug paraphernalia itself. The questioning clearly was targeted at soliciting an admission from Bowker. We have said that when questioning goes beyond the purpose of general fact finding and is used to elicit a culpable response, *Miranda* warnings are required. State v. Myhre, 2001 SD 109, ¶¶20-21, 633 NW2d 186, 190.

[¶62.] At no time did the officers inform Bowker of her *Miranda* rights, even though they were discussing whether to arrest her. A reasonable person in Bowker's situation would have considered herself in custody. Therefore, based on the facts and circumstances surrounding the interrogation, I would conclude that Bowker was in custody and that the officers should have given Bowker her *Miranda* rights before they questioned her concerning whether she had knowledge of the drugs and paraphernalia. Ultimately, her answers were used by the State to prove she had knowledge. Her statements should have been suppressed as the fruit of an unlawful custodial interrogation.

[¶63.] The State claims that even if the trial court erred by not suppressing Bowker's statements, the error was harmless. "Erroneous admission of statements obtained in violation of *Miranda* may constitute harmless error when there remains overwhelming independent evidence of guilt." State v. Stanga, 2000 SD 129, ¶20 617 NW2d 486, 491 (citing Arizona v. Fulminante, 499 US 279, 306, 111 SCt 1246, 1263, 113 LEd2d 302, 329 (1991); SDCL 15-6-61; SDCL 23A-44-14 (Rule 52(a))). We must be able to say that the error was harmless beyond a reasonable doubt. State

v. Zakaria, 2007 SD 27, ¶19, 730 NW2d 140, 146 (citations omitted).  We have

explained harmless error as follows:

> The harmless error doctrine preserves the essential purpose of
> criminal trials:  to decide a defendant's guilt or innocence.  The
> rule promotes public respect for the criminal process by focusing
> on the underlying fairness of the trial rather than on the
> virtually inevitable presence of immaterial error.  The harmless
> error rule governs . . . provided the court is able to declare a
> belief beyond a reasonable doubt that the error was harmless
> and did not contribute to the verdict obtained.  [H]armlessness
> must . . . be determined on the basis of the remaining evidence.

*Id.* (citations omitted).  When analyzing the effect the erroneously admitted

evidence had on the trial, we need to consider the elements of the offense along with

the other evidence.  *Id.*

[¶64.]     The court instructed the jury that the State had to prove that Bowker

"knowingly [had] been in possession of methamphetamine" and "knowingly used or

possessed with intent to use, drug paraphernalia."  The court further instructed

that "the mere fact that a person is near a location or had access to a place where

methamphetamine is found is not, by itself, sufficient proof of possession."  Crucial

to the State's case was proving that Bowker knowingly possessed illicit drugs and/or

paraphernalia.

[¶65.]     As evidenced by the prosecutor's comments to the trial court and the

jury, Bowker's statements to the police played an important part in that proof.

When settling instructions, the prosecutor asked the court to instruct the jury

concerning admissions made by a defendant other than during the trial.  The

instruction read in part as follows:

> A statement made by a defendant other than at his trial
> may be an admission.

> An admission is a statement by a defendant admitting one or more of the facts at issue. It is not sufficient by itself to prove guilt of the crime charged, but it may prove one or more of the elements of the crime charged.

In support of the court giving the instruction, the prosecutor told the court, "I think the things [Bowker] said to the police are statements. They make up a good bit of probably the State's case or the State's argument." Defense counsel objected to the instruction, and the court asked the prosecutor, "what statement would be an admission?" The prosecutor answered, "Well, [Bowker] had stayed there 10 to 14 nights in a row. That she had possessions there in the premises. That she had seen those three pipes before."

[¶66.]    Additionally, the prosecutor acknowledged that the main issue for the State in this case was proving that Bowker had knowledge. He said in his closing argument to the jury:

> If there is an issue in the case which you could detect from the evidence offered by the defense as well as the cross examination of State's witnesses, that would be the element of knowing possession of a controlled substance.
>     As to knowing, the knowing aspect of the possession, I submit to you that when the defendant told the officers that morning that the pipes weren't hers but she had seen them before, that is proof of her knowledge of those pipes. If you take that statement, that admission in the context of all the rest of the evidence in the case, it becomes an important admission, an important element of knowledge.

The prosecutor lists all the other pieces of evidence that showed that Corbine was involved with drugs and then again used Bowker's statements to argue that she had knowledge:

> I submit to you you couldn't be within this house without knowing what was going on there. You certainly couldn't be a girlfriend of Mr. Corbine for 90 days or four months, stay there

-32-

> four or five nights per week, stay there for 10 to 14 nights in a
> row and not know what was going on.
> ***
> She admitted to the officers she sometimes slept in that
> bedroom. She certainly had access to it.
> ***
> So again, that State wasn't required to prove use or ownership.
> The State was required to prove possession and the knowing
> exercise of dominion or control. She was in possession of the
> objects in question. She knew of their character and that's
> why the first thing out of her mouth when she saw the cops
> was you can't be here without a search warrant or words to
> that effect.

Then in rebuttal, the prosecutor summed up with the following:

> She admitted she had seen the pipes before. She knows he is an
> addict. And the first words out of her mouth are you can't come
> in here without a search warrant. I submit to you that that is
> strong evidence of consciousness, knowing possession of the
> illegal controlled substances within those premises.

[¶67.]     Without Bowker's statements to the police, the evidence against

Bowker is not overwhelming. Besides her admissions, the other evidence against

her consists mainly of her proximity to Corbine's drugs and paraphernalia. The

officers found her and her children staying in Corbine's apartment where the

evidence of drugs (most of the indicia of its presence was in the closet) and drug

pipes were found. The officers evidently did not observe any signs that she had

been using nor did she admit to using. Consequently, most of the State's evidence

of her "knowing possession" depended on three of her answers to the officers'

questions. First, the State placed a substantial amount of emphasis on her

admission that "she had stayed there 10 to 14 nights in a row." Second, the State

relied heavily on the fact that she admitted that her possessions were in close

proximity to the illicit items. Third, the State heavily touted Bowker's admission

that she had seen the three meth pipes in the residence. All of these statements/admissions derived from the custodial interrogation of Bowker.

[¶68.] Corbine testified in Bowker's defense and explained that the only reason the meth pipes were in plain view was because he was rearranging his room that morning while Bowker slept in the living room with her children. He further testified that other paraphernalia was always hidden from Bowker. Corbine also claimed to be unaware of Bowker's knowledge of the drug paraphernalia. Although the State can argue that the jury discounted Corbine's testimony because he was a convicted drug felon, his testimony was before the jury.

[¶69.] Given the facts in this case, I am unable "to declare a belief beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained." *See Zakaria*, 2007 SD 27, ¶19, 730 NW2d at 146 (citations omitted). This case should be reversed and remanded for a new trial with the evidence derived from the custodial interrogation suppressed.