#24027-a-RWS

**2007 SD 77**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                                    Plaintiff and Appellee,

  v.

MARGARET DILLON,                                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
MELLETTE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE MAX A. GORS
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

FRANK GEAGHAN
Assistant Attorney General
Pierre, South Dakota                                    Attorneys for plaintiff
                and appellee.

SANDY J. STEFFEN
Gregory, South Dakota                                    Attorney for defendant
                and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MAY 21, 2007

OPINION FILED **07/25/07**

#24027

SABERS, Justice.

[¶1.]        After the police entered the home of Margaret "Peggy" Dillon (Dillon) claiming exigent circumstances, they found evidence of marijuana use in plain view. Using this evidence, the police applied for and were granted a search warrant for the home. During this search, the police found 2.9 pounds of marijuana. A warrant for Dillon's arrest and a search warrant for her urine were issued. After a positive urinanalysis indicated Dillon had ingested marijuana, she was charged with and found guilty of ingesting an intoxicant other than an alcoholic beverage. She appeals and we affirm.

## FACTS

[¶2.]        Around 2 a.m. on November 28, 2004, Chief Deputy Sheriff Dustin Baxter of the Mellette County Sheriff's Office responded to a reported stabbing in Horse Creek Housing near White River, South Dakota and a request to render first aid. Once there, he found Derek Rattling Leaf had been stabbed twice in the upper torso and once in the hip. When asked, Rattling Leaf indicated the stabbing had occurred in White River at the Dillon residence. Dillon rented the residence, but she did not live there. She lived with her boyfriend outside of White River, while Dillon's son, Travis Brandis, lived at the rental home along with Susan Beckers and Layne Arrow, among others.

[¶3.]        Due to a call from Winner, South Dakota dispatch regarding a disturbance at the Dillon home, Chief Deputy Baxter learned Deputy Justin Hooper was at the residence. Chief Deputy Baxter proceeded to the Dillon residence. According to Chief Deputy Baxter, he went to help Deputy Hooper because he was

-1-

unsure if Deputy Hooper knew a stabbing had just occurred there and was concerned for his safety.

[¶4.]     Meanwhile, Deputy Hooper spoke with Susan Dillon and Susan Becker, who were outside the Dillon residence and appeared to be arguing with each other. The women told Deputy Hooper that Gilbert Rattling Leaf, the stabbing victim's brother, was inside, intoxicated and trying to fight. Deputy Hooper went inside the Dillon residence and spoke with Gilbert. Upon questioning, Gilbert told Deputy Hooper that Courtney Krogman was the one who had stabbed his brother Derek.

[¶5.]     Deputy Hooper went upstairs to speak with Krogman. He noticed two spots of blood on the stairwell inside the Dillon residence. While the two were speaking, Chief Deputy Baxter arrived and took Krogman outside. According to Chief Deputy Baxter, Krogman implicated Layne Arrow in Derek's stabbing. The deputies began looking for Layne Arrow.

[¶6.]     Shortly thereafter, the deputies learned Layne Arrow was a second stabbing victim and he was at his sister's house. When the deputies questioned Arrow's sister, she confirmed he had been stabbed but had left her house. The deputies were informed that Arrow was inside the Dillon residence and he was with the person who stabbed him, so they returned to the residence.[1]

---

1.    After speaking with Arrow's sister, Chief Deputy Baxter received a call about a burglary and vehicle theft in Norris, South Dakota. According to Chief Deputy Baxter, he left Deputy Hooper to look for Arrow while Deputy Hooper handled the other call. He testified that some other officer handled the call before he made it to Norris and he returned to the Dillon residence around the same time Detective Hooper arrived at the residence.

[¶7.]    At some point in the night, the officers requested the assistance of the South Dakota Division of Criminal Investigation (DCI).  The deputies were joined by DCI Agent Shannon Riter at the Dillon residence.  The three knocked on the door, announced their presence, and attempted to get someone to open the door.  According to Chief Deputy Baxter, they heard a male voice and people moving around in the house, but nobody would answer the door.  Chief Deputy Baxter testified he was "concern[ed] for the safety of Layne Arrow" so they entered the home.

[¶8.]    While looking for Arrow, Chief Deputy Baxter looked behind a computer desk that was angled in such a way it could hide a person.  He discovered "a bag with green stems and seeds, which appeared to be that of marijuana."  Next to this bag was a black and yellow bag that held more baggies.  The officers did not find Arrow in the home, but took the bag of marijuana stems and seeds.  Based on this evidence and Chief Deputy Baxter's observations, the Mellette County Clerk of Courts issued a search warrant for the Dillon residence.

[¶9.]    The search warrant was executed on December 10, 2004.  During the search of the Dillon residence, officers discovered 2.9 pounds of marijuana and other drug paraphernalia.  On December 11, Chief Deputy Baxter obtained a warrant for Dillon's arrest and a search warrant for a urine sample from Dillon and others.  She turned herself in to the Mellette County Sheriff's Office on December 14, 2004.  Dillon's urine sample tested "positive for cannabinoids . . . components of marijuana."

[¶10.] Initially, Dillon was charged with keeping a place for the use or sale of a controlled substance. On January 12, 2005, the State filed an amended complaint charging Dillon with keeping a place for the sale or use of a controlled substance; distribution of marijuana; possession of marijuana; and ingesting intoxicants other than an alcoholic beverage.

[¶11.] A preliminary hearing was held on January 19, 2004. At the preliminary hearing, the state's attorney dismissed the charge of keeping a place for the sale or use of a controlled substance. The court found the State met its burden of demonstrating probable cause on the other charges in the amended complaint.

[¶12.] The State filed an Information on April 25, 2005, charging Dillon with distribution or possession with intent to distribute one pound or more of marijuana; possession of marijuana; and ingesting intoxicants other than an alcoholic beverage. Prior to trial, the State dismissed the distribution and possession charges. Therefore, the only charge at trial was the ingestion charge.

[¶13.] Dillon moved to suppress the evidence. A hearing was held and the trial court denied the motion and a jury trial started on September 16, 2005. However, that trial ended in a mistrial after one of the jurors informed the bailiff that she "was on the June trial . . . they had the hearing for the stabbing." Concerned she may have heard evidence that may not be included in this trial, the court granted a mistrial.

[¶14.] A second trial started on November 21, 2005. Dillon was found guilty of ingesting intoxicants other than an alcoholic beverage. She was sentenced on January 17, 2006, to one year in the Mellette County jail and all but thirty days of

the sentence was suspended. Dillon appealed and this Court remanded on June 30, 2006 for entry of findings of fact and conclusions of law. In this appeal, Dillon raises the following issue:

> Whether exigent circumstances existed to justify the warrantless entry into the Dillon residence.

## STANDARD OF REVIEW

[¶15.] Our review of a motion to suppress is de novo. *State v. Sweedland,* 2006 SD 77, ¶12, 721 NW2d 409, 412 (quoting *State v. Chavez,* 2003 SD 93, ¶13, 668 NW2d 89, 95) (additional citation omitted). Nonetheless, findings of fact made by the trial court are reviewed for clear error. *Id.* "Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo." *Id.* The issue of whether an exception to the warrant requirement applies is reviewed de novo. *State v. Hess,* 2004 SD 60, ¶9, 680 NW2d 314, 319.

[¶16.] Dillon claims that the necessary exigent circumstances did not exist on November 28, 2004, to enter the residence without a warrant. If exigent circumstances did not exist, then the marijuana observed in plain view cannot be the basis for the search warrant because the officers were not lawfully in the residence. *See* Horton v. California, 496 US 128, 136, 110 SCt 2301, 2308, 110 LEd2d 112 (1990) ("It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed.").

[¶17.] As we have previously noted, the Fourth Amendment to the United States Constitution[2] and Article VI, section 11 of the South Dakota Constitution[3] generally require a warrant prior to entering a home for the purpose of search and seizure. *Sweedland*, 2006 SD 77, ¶13, 721 NW2d at 412; *Hess*, 2004 SD 60, ¶22, 680 NW2d at 324. However, there are exceptions to the general warrant requirement. This case concerns the exigent circumstances exception. *See Hess*, 2004 SD 60, ¶24, 680 NW2d at 325. The State argued, and the trial court agreed, that exigent circumstances existed on November 28, 2004, that allowed the officers to enter the home without a warrant.

[¶18.] Exigent circumstances exist when "a situation demand[s] immediate attention with no time to obtain a warrant." *Id.* ¶24. In determining whether exigent circumstances exist we ask, "Whether police officers, under the facts as they knew them at the time, would reasonably have believed that delay in procuring a search warrant would gravely endanger life, risk destruction of evidence, or greatly enhance the likelihood of a suspect[']s escape." *Id.* ¶25. The inquiry is one of

---

2. The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

3. Article VI, section 11 provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause

(continued . . .)

objective reasonableness. Brigham City, Utah v. Stuart, ___ US ___, ___, 126 SCt 1943, 1948, 164 LEd2d 650 (2006); United States v. Clement, 854 F2d 1116, 1119 (8thCir 1988). Furthermore, "[e]xigency remains 'within the narrow range of circumstances that present real danger to the police or the public or a real danger that evidence or a suspect might be lost.'" State v. Lamont, 2001 SD 92, ¶22, 631 NW2d 603, 610 (quoting United States v. Bulman, 667 F2d 1374, 1384 (11thCir 1982).

[¶19.]     In 2006, the United States Supreme Court examined "whether police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Brigham City*, ___ US at ___, 126 SCt at 1946, 164 LEd2d 650. In *Brigham City*, the police were investigating a report of a loud party. *Id.* They heard shouting inside and saw two juveniles drinking beer in the backyard. *Id.* As they entered the backyard, they saw a fight occurring inside the home. *Id.* They observed an adult spitting blood into the sink and other adults attempting to restrain the juvenile that had hit the adult. *Id.* The police entered the home, announced their presence and arrested Stuart and others for contributing to the delinquency of a minor and other crimes. *Id.*

[¶20.]     Stuart argued, and the Utah courts agreed, that the entry was not acceptable under either the "emergency aid doctrine" or the exigent circumstances

---

(. . . continued)

supported by affidavit, particularly describing the place to be searched and the person or thing to be seized.

exception. *Id.* at ___, 126 SCt at 1946-47, 164 LEd2d 650. The Supreme Court, however, unanimously reversed finding "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* at ___, 126 SCt at 1947, 164 LEd2d 650. It noted that "one exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Id.* "'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Id.* (citing Mincey v. Arizona, 437 US 385, 392, 98 SCt 2408, 2413, 57 LEd2d 290 (1978) (quoting Wayne v. United States, 318 F2d 205, 212 (DCCir 1963) (Burger, J.))); State v. Heumiller, 317 NW2d 126, 129 (SD 1982) (additional citations omitted).

[¶21.]     The Court rejected Stuart's two attempts to avoid the exigent circumstances doctrine. First, Stuart argued the police were there primarily to make arrests not to render help, so the Court should deny the use of the exigent circumstances doctrine if the police were "primarily motivated by intent to arrest or seize evidence." *Brigham City,* __ US at ___, 126 SCt at 1948, 164 LEd2d 650. However, the Court noted that the officers' subjective state of mind does not matter as long as the actions were reasonable when viewed objectively. *Id. See Lamont,* 2001 SD 92, ¶21, 631 NW2d 603, 610.

[¶22.]     Next, Stuart argued, based on the decision in *Welsh v. Wisconsin,* 466 US 740, 753, 104 SCt 2091, 2099, 90 LEd2d 732 (1984), that his conduct was not serious enough to warrant the intrusion. *Brigham City,* ___ US at ___, 126 SCt at 1948-49, 164 LEd2d 650. However, the Court explained his reliance on *Welsh* was

incorrect. According to the Court, the entry into the home was plainly reasonable based on the officers' objectively reasonable belief that the injured adult might need help and the violence could continue. *Id.* at ___, 126 SCt at 1949, 164 LEd2d 650.

[¶23.] In this case, the trial court found that the officers possessed these facts:

1. An emergency existed as one person had already been stabbed three times, in the chest and torso area.

2. They were told Arrow had also been stabbed and was at his sister's home.

3. Arrow's sister confirmed he had been stabbed, but was no longer there.

4. Chief Deputy Baxter told Arrow's sister that he wanted to find him so they could get him help and she did not say that he did not need medical help.

5. Susan Dillon would not initially tell Chief Deputy Baxter where Arrow was located. When told, "we have a bleeding person, you don't want that on your head" she told the police Arrow was at the Dillon residence.

6. When the officers knocked and announced their presence at the Dillon residence, they heard a male voice and movement, but no one would open the door, despite repeated requests.

7. Based on concerns for Arrow's safety, the officers entered the home.

[¶24.] Dillon claims the actions are not reasonable because Susan Dillon told Chief Deputy Baxter, the cut was not too bad and it was an accident. Furthermore, Dillon claims that two hours had elapsed since the phone call reporting the stabbing occurred, thus no emergency existed. It would be unreasonable to expect the police to believe Arrow was not really injured, stop their investigation and simply ignore the possibility he could be in need of some assistance of which Susan Dillon was not

aware or not divulging. This is especially true when Susan Dillon had already lied to the officers about who had stabbed Rattling Leaf and tried to tell the police Rattling Leaf "had hit some glass on the stairwell and that's where the blood came from." Viewing these facts and the police actions using the objectively reasonable standard indicates exigent circumstances existed.

[¶25.]        The officers had a man stabbed three times – twice in the upper torso and once in the hip. Investigation of this stabbing led them to and confirmed a second injured person. Just like the officers in *Brigham City*, "the officers had an objectively reasonable basis for believing that . . . the injured adult might need help . . . ." *See* ___ US at ___, 126 SCt at 1949, 164 LEd2d 650. In this case, the circumstances may warrant emergency entry more than the *Brigham City* case. In *Brigham City*, the officers could see the adult and determine his injury without entry into the home. *Id.* Here, the police officers could not see the victim and could only hear that someone was in the home and would not, or could not, answer the door.

[¶26.]        Furthermore, Dillon argues that the actions were not reasonable because they had been observing her house for a while and the entry was a pretext in order to find drugs. It does not appear that the entry was a pretext. The trial court found the officers did not immediately go to the Dillon residence and instead went to Arrow's sister's house to look for him because that is where their investigation led. It noted that the entry would have been suspicious had the officers went directly to the Dillon residence, but instead, the police looked for

Arrow instead of seizing the opportunity to enter the Dillon residence under the guise of helping or looking for Arrow.

[¶27.] In any event, we need not decide that claim. The subjective motivations for entry are irrelevant so long as the actions are reasonable when viewed objectively. *Id.* at ___, 126 SCt at 1948, 164 LEd2d 650. *See also Lamont*, 2001 SD 92, ¶21, 631 NW2d at 610 (citing Arkansas v. Sullivan, 532 US 769, 771-72, 121 SCt 1876, 1878, 149 LEd2d 994 (2001) (additional citation omitted) ("An objectively reasonable search based on probable cause will not be rendered invalid even when the motive for the search was pretextual.")). As noted above, the actions are objectively reasonable.

[¶28.] We agree with the trial court that exigent circumstances existed. As we noted in *Lamont*,

> The spirit of the Fourth Amendment is reasonableness. Sitting in the sanctuary of our chambers with the advantage of hindsight, we may well analyze positions with exhaustive and clinical precision. But the officers acting in the wee hours of the night in the midst of their field investigation, with events changing and unfolding, had to use their best judgment in the moment. They were confronted with a difficult choice.

2001 SD 92, ¶38, 631 NW2d at 616. Entering the home without a warrant to check on and help a stabbing victim falls within the Fourth Amendment's reasonableness standard. As the United States Supreme Court explains, "[I]t would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur . . . ." Georgia v. Randolph, 547 US 103, ___, 126 SCt 1515, 1525, 164 LEd2d 208 (2006).

[¶29.]     Dillon attempts to raise two issues under *State v. Korth*. 2002 SD 101, ¶17, 650 NW2d 528, 536. However, it is improper procedure to include a Part B section with client issues when counsel has identified an arguably meritorious issue. State v. Lewis, 2005 SD 111, ¶7 n2, 706 NW2d 252, 255 n2. Therefore, these issues are not properly before this Court. *Id.*

[¶30.]     Affirmed.

[¶31.]     GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.