#27817-a-GAS

**2016 S.D. 83**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                   Plaintiff and Appellee,

    v.

JAMES LEWIS ROGERS, JR.,                 Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE RANDALL L. MACY
Judge

* * * *

MARTY J. JACKLEY
Attorney General

ANN C. MEYER
Assistant Attorney General
Pierre, South Dakota                     Attorneys for plaintiff
                                         and appellee.


PAUL EISENBRAUN
ELLERY GREY of
Grey & Eisenbraun
Rapid City, South Dakota                 Attorneys for defendant
                                         and appellant.


* * * *

ARGUED NOVEMBER 7, 2016
OPINION FILED **11/22/16**

SEVERSON, Justice

[¶1.]        A jury convicted James Rogers of first-degree murder. The circuit court sentenced him to life imprisonment without parole. On appeal, Rogers asserts that the court erred by failing to suppress evidence that was obtained without a warrant and failing to suppress statements Rogers made prior to law enforcement informing him of his *Miranda* rights. We affirm.

## Background

[¶2.]        On August 17, 2015, Deborah Burrows called the Lead Police Department and asked that an officer come to her home. The Department assigned Officer Jandt to answer the call. When Officer Jandt arrived at Deborah's house, he activated a tape recorder. Deborah reported that her ex-husband, Ken Burrows, had informed her that someone, later identified as James Rogers, wanted help getting rid of a body. Ken told Deborah that Rogers' girlfriend was the victim and that her body was in a suitcase in the apartment. Ken observed blood in the kitchen of Roger's apartment. Deborah reported that Ken was still in her home, and Officer Jandt asked to speak directly with Ken.

[¶3.]        Ken Burrows came outside to speak with Officer Jandt. He informed Officer Jandt that Rogers told Ken that Rogers had killed Caitlin Walsh. Rogers lived in apartment 303 of the Galena Street Apartments, where he still had Walsh's body in a suitcase that was wrapped in plastic. Rogers wanted Ken's help disposing of the body, but Ken refused, fearing that he would be an accessory to murder. Ken had been in the apartment just fifteen minutes prior. Rogers had been crying, and there was blood on the floor of the apartment. Ken relayed that he had grabbed the

suitcase in an attempt to lift it and that it was heavy. Rogers told Ken that Walsh barely fit inside. Rogers also told Ken that he had beaten and stabbed Walsh. Ken told Officer Jandt several times that he was not sure if Rogers was telling him the truth or if the whole thing was a hoax. He never saw a body, but he wanted police to look into the situation immediately.

[¶4.] Officer Jandt contacted the Lead Chief of Police, John Wainman, and asked Chief Wainman to meet him in person at the Galena Street Apartments where Rogers lived. The two met at the rear entrance, and Officer Jandt relayed what the Burrows had reported. Chief Wainman knew of Rogers and Walsh's relationship and that it was volatile. The two entered the third floor of the apartment complex. As they walked down the hall towards apartment 303, they heard a male subject, later identified as Rogers, crying. The crying became louder the closer the officers moved towards apartment 303. They also heard Rogers saying "I'm sorry." Hearing that, the officers thought that someone else may be in the apartment. They believed it was possible that Walsh was still alive or that Rogers may be injured. They knocked on the door to apartment 303, asking if Rogers was okay and that he open the door. The officers asked Rogers several times to open the door. Rogers did not open the door, and the crying stopped. When Rogers went silent, Chief Wainman attempted to forcibly open the door. Chief Wainman contacted the property manager for a key to the apartment, but she was out of town and unable to obtain a key for him. Therefore, he directed Officer Jandt to get tools from one of their police vehicles. Chief Wainman began taking the molding off of the door.

[¶5.] Eventually, Rogers came to the door and unlocked it. When he did so, Chief Wainman asked him multiple times to come outside. Rogers did not comply, and Chief Wainman pulled him from the apartment and asked Rogers what he had done. Rogers responded that he "did something very wrong." Chief Wainman entered the apartment and could detect the smell of decomposition, but did not see a suitcase. He came back to the hallway and asked Rogers where Walsh was. Rogers indicated that she was "in the closet." Chief Wainman entered the apartment a second time and opened the closet. At that point, he discerned that the strong odor of decomposition was coming from the closet. He also saw the suitcase and that there was liquid oozing out of it and onto the carpet. Upon pulling on the suitcase, he noted that it contained something heavy, consistent with a body. He took a picture of the suitcase, left the apartment, and directed Officer Jandt to take Rogers to the Lawrence County Jail.

[¶6.] Chief Wainman asked another officer of the Lead Police Department to come to the scene and take pictures. After additional pictures were taken, officers left the apartment and requested assistance from other law enforcement agencies. Approximately five hours later, law enforcement obtained a search warrant and returned to the apartment to retrieve the suitcase. The remains of Caitlin Walsh were found inside the suitcase.

[¶7.] At the Lawrence County Sherriff's Office, law enforcement interviewed Rogers. Before officers were able to read Roger his *Miranda* rights, Rogers stated "I never meant to hurt her." As Agent Garland was reading a *Miranda* warning to Rogers, Rogers interrupted and stated, "I'll tell you anything you want to know." In

response, Agent Garland started reading the *Miranda* warnings from the beginning. At the end of the advisement, Agent Garland asked Rogers: "Do you understand those rights James?" Rogers replied, "I think so, yes." For a second time, Agent Garland asked, "Do you understand those rights?" This time, Rogers replied, "Yes, sir." Agent Garland then asked, "Keeping those rights in mind, is it okay if [another officer] and I ask you some questions?" Again, Rogers replied, "Yes." Law enforcement proceeded to question Rogers, and Rogers admitted to stabbing Walsh with a machete.

[¶8.]     Prior to trial, Rogers moved to suppress all evidence obtained from the search of his apartment because law enforcement had entered and searched his apartment without first obtaining a search warrant. Rogers also moved to suppress the statements made by him that he had done "something very wrong" and that Walsh was "in the closet." The circuit court denied Rogers' motion, concluding that exigent circumstances existed justifying the warrantless search and that the community caretaker doctrine applied. It also found that suppression of Rogers' statements was not warranted because Rogers was not in custody when he made his statements. The case proceeded to trial, and a jury found Rogers guilty of first-degree murder. The court sentenced Rogers to life imprisonment without parole. Rogers appeals the circuit court's denial of his motion to suppress. In this appeal, he contends that the court erred when it found that exceptions to the warrant requirement existed. He also contends that the court erred by failing to suppress his statements made to law enforcement prior to receiving *Miranda* warnings.

## Standard of Review

[¶9.]    "We review the court's grant or denial of a motion to suppress involving an alleged violation of a constitutionally protected right under the de novo standard of review.  The court's findings of fact are reviewed under the clearly erroneous standard, but we give no deference to the court's conclusions of law." *State v. Fischer*, 2016 S.D. 12, ¶ 10, 875 N.W.2d 40, 44 (quoting *State v. Fierro*, 2014 S.D. 62, ¶ 12, 853 N.W.2d 235, 239).

## Analysis

[¶10.]    1.    *Whether an exception to the warrant requirement exists.*

[¶11.]    We first consider whether the trial court erred by denying Rogers' motion to suppress the evidence obtained from the warrantless search of his apartment.  "Warrantless searches are per se unreasonable, apart from a few, well-delineated exceptions, and it is the State's burden to prove that the search at issue falls within a well-delineated exception to the warrant requirement." *Id.* ¶ 13, 875 N.W.2d at 45 (quoting *Fierro*, 2014 S.D. 62, ¶ 15, 853 N.W.2d at 240).  The State must prove by a preponderance of the evidence that the warrantless search satisfied an exception. *State v. Deneui*, 2009 S.D. 99, ¶ 14, 775 N.W.2d 221, 230.  The State sets forth three exceptions that it contends are applicable to this case: exigent circumstances, inevitable discovery, and the community caretaker doctrine.

[¶12.]    "The exigent circumstances exception is one of the well-delineated exceptions to the warrant requirement." *Fischer*, 2016 S.D. 12, ¶ 13, 875 N.W.2d at 45 (quoting *Fierro*, 2014 S.D. 62, ¶ 17, 853 N.W.2d at 240).  "Exigent circumstances exist when a situation demands immediate attention with no time to

obtain a warrant." *State v. Bowker*, 2008 S.D. 61, ¶ 19, 754 N.W.2d 56, 63 (quoting *State v. Dillon*, 2007 S.D. 77, ¶ 18, 738 N.W.2d 57, 60). "The need to protect or preserve life or avoid serious injury presents that kind of situation." *Id.* "In determining whether exigent circumstances exist[,] we ask, 'Whether police officers, under the facts as they knew them at the time, would reasonably have believed that delay in procuring a search warrant would gravely endanger life, risk destruction of evidence, or greatly enhance the likelihood of a suspect's escape.'" *Dillon*, 2007 S.D. 77, ¶ 18, 738 N.W.2d at 60-61 (quoting *State v. Hess*, 2004 S.D. 60, ¶ 25, 680 N.W.2d 314, 325). We consider "the facts as perceived by the police at the time of entry, not as subsequently uncovered." *State v. Meyer*, 1998 S.D. 122, ¶ 23, 587 N.W.2d 719, 724.

[¶13.]    In this case, Officer Jandt received information that a potential homicide had taken place. Ken indicated that he had been asked to help remove a body. Ken had lifted a heavy suitcase that allegedly contained a body. However, as the circuit court found, Ken did not know whether someone had actually been injured. He saw no body and could not tell Officer Jandt for sure whether a homicide had already occurred. However, Ken relayed that he thought there was blood on the floor of Rogers' apartment. Therefore, Officer Jandt was unaware whether an alleged victim was already deceased or badly injured.

[¶14.]    Officer Jandt conveyed this information to Chief Wainman, and the two decided to follow up by going to Rogers' apartment. The circuit court found that they believed there was a possibility that Walsh could still be alive, but seriously injured. Upon their arrival in the hallway outside of Rogers' apartment, they heard

Rogers crying and saying that he was "sorry." The court also found that the officers believed that Rogers was talking to someone in the apartment, supporting the belief that Walsh could still be alive. Thus, the officers were faced with a situation where they believed immediate action was necessary to protect or preserve Walsh's life. Upon getting Rogers out of the apartment, Chief Wainman entered the apartment looking for Walsh. When Chief Wainman could not find her, he came out and asked Rogers where she was. Rogers indicated that she was in the closet. Once Chief Wainman entered the apartment again and determined for himself that the smell of decomposition was coming from the closet and that liquid was oozing from the suitcase—wrapped in plastic, in the closet— he left the apartment. Law enforcement did not investigate the contents of the suitcase until after they had secured a search warrant.

[¶15.] We cannot say that the circuit court's findings of fact are clearly erroneous. Therefore, we conclude that the officers' actions in this case were objectively reasonable in light of the information they possessed. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947, 164 L. Ed. 2d 650 (2006) (quoting *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S. Ct. 2408, 2413, 57 L. Ed. 2d 290 (1978)). Here, the officers acted reasonably to determine whether Walsh needed immediate medical attention. Not knowing her condition and aware that they had a report of blood in Rogers' apartment, there was a risk that she would die in the time it took to obtain a warrant. Because exigent circumstances existed justifying the officers'

warrantless entry of Rogers' apartment, we do not address the alternative warrant exceptions asserted by the State.

[¶16.]    2.    *Whether the circuit court erred when it denied Rogers' motion to suppress statements to law enforcement.*

[¶17.]    Rogers also maintains that the court erred by failing to suppress the statements that he made to law enforcement in the hallway of his apartment building before he received the *Miranda* warnings.  At Rogers' apartment, he told officers that he "did something very wrong."  He also indicated that Walsh was "in the closet."  According to Rogers, he was in custody at that point and his statements were thus obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[¶18.]    Admission of Rogers' statements was proper.  We need not determine whether Rogers was in custody.  Officers were responding to a situation that demanded immediate attention, and Chief Wainman's questions were "general on-the-scene" ones intended to quickly ascertain where Walsh was located and whether she was in danger and needed assistance.  *See State v. McCahren*, 2016 S.D. 34, ¶ 32, 878 N.W.2d 586, 600.  Furthermore, even if the statements were obtained in violation of *Miranda,* their admission was harmless.  "The harmless error rule governs even constitutional violations, not requiring the automatic reversal of a conviction, provided the [C]ourt is able to declare a belief beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained."  *State v. Berget,* 2013 S.D. 1, ¶ 114, 826 N.W.2d 1, 36 (quoting *State v. Younger,* 453 N.W.2d 834, 838 (S.D. 1990)).  "[A]dmission of evidence in violation of the Fifth Amendment

is subject to harmless error analysis." *Id.* ¶ 115 (citing *Neder v. United States,* 527 U.S. 1, 18, 119 S. Ct. 1827, 1838, 144 L. Ed. 2d 35 (1999)).

[¶19.]     "Harmlessness must be determined on the basis of the remaining evidence." *Id.* ¶ 117 (quoting *State v. Zakaria,* 2007 S.D. 27, ¶ 19, 730 N.W.2d 140, 146). In this case, there was sufficient evidence introduced at trial that this "Court is able to declare beyond a reasonable doubt" that those statements were harmless. *See id.* ¶ 114. On two separate occasions, law enforcement interviewed Rogers, and he agreed to speak with them. In each interview, Rogers admitted to stabbing Walsh with a machete. The jury heard his admissions. Testimony at trial established that Walsh had at least two fatal stab wounds. Rogers' palm print was discovered in the blood on the handle of the machete used to stab Walsh. And the blood found in his apartment matched that of Walsh. Accordingly, in light of this other evidence, even if they were not otherwise admissible, introduction of Rogers' statements at his apartment was harmless.

## Conclusion

[¶20.]     Exigent circumstances justified the warrantless entry into Rogers' apartment by law enforcement. In addition, Rogers' statements to law enforcement at his apartment do not require reversal. Therefore, we affirm.

[¶21.]     GILBERTSON, Chief Justice, and ZINTER, WILBUR and KERN, Justices, concur.