#29817-a-PJD
**2023 S.D. 42**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

     v.

BOL KWAI,                           Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CAMELA C. THEELER
Judge

* * * *

EDWARD P. ANGEL
Sioux Falls, South Dakota          Attorney for defendant
                                  and appellant.

MARTY J. JACKLEY
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota             Attorneys for plaintiff
                                  and appellee.

* * * *

CONSIDERED ON BRIEFS
NOVEMBER 8, 2022
OPINION FILED **08/09/23**

DEVANEY, Justice

[¶1.]	This appeal involves an altercation that occurred between the defendant and the driver of another vehicle after the defendant failed to stop at a red light and almost hit the other driver's vehicle.  The defendant was charged with multiple offenses stemming from the events that ensued thereafter, and after a jury trial, the defendant was found guilty of aggravated assault and felony hit and run. The defendant appeals, and although his appellate counsel submitted what purports to be a *Korth* brief relating the issues the defendant wished to raise on appeal, counsel asserts an arguably meritorious issue in Section A, namely, whether the felony hit and run statute applies to intentional conduct.  We address only the arguably meritorious issue, and we conclude that the felony hit and run statute applies regardless of whether the defendant's acts were intentional.

**Factual and Procedural Background**

[¶2.]	In the later evening on April 25, 2020, Brian Heesch was driving with his girlfriend, Bernadette, in her van in Sioux Falls, South Dakota, when the driver of another vehicle failed to stop at a red light and almost hit the van.  After Brian slammed on his breaks to avoid a collision, he yelled and made gestures at the other driver.  The other driver was later identified as Bol Kwai.  Brian observed that Kwai was on a cell phone and appeared to be arguing with the person on the other line.

[¶3.]	At the next red light, Brian's and Kwai's vehicles were stopped next to each other, and Kwai began yelling at Brian and continued to yell at him when the two stopped at the next intersection.  Brian testified that he decided to turn off the

main road at the second intersection to avoid Kwai, but Kwai followed him. According to Brian, Kwai then positioned his vehicle in front of Brian's and blocked Brian's passage on the road. Kwai got out of his vehicle and walked toward Brian's. Brian testified that he decided to get out of the van because "something [was] going to happen[.]" He and Kwai began yelling at each other, and then Kwai punched Brian in the mouth, causing Brian's hat to fall off of his head. Brian testified that he told Kwai to leave and that he did not "want any problems." Brian bent over to pick up his hat, and when he stood up, Kwai was gone. Bernadette testified that she did not see Kwai punch Brian, but that Brian told her, as he was getting back into the van, that "[h]e just hit me[.]"

[¶4.] Once inside the van, Brian decided to drive in the direction the couple had originally planned to go, but he noticed Kwai's vehicle in front of him again and decided instead to follow Kwai to try to get his license plate number. Brian testified that neither he nor Bernadette could make out the license plate number because it was blocked by a covering. While Brian was following Kwai, Kwai pulled over alongside the road. When Brian drove past him, Kwai either threw something or otherwise made contact with the van, causing the windshield to shatter.

[¶5.] Brian testified that he stopped the van and got out, and while he was walking toward Kwai, he saw Kwai holding what he thought was a metal pipe in his hand. Brian testified that he continued to walk toward Kwai because he has martial arts experience and believed he would be able to grab Kwai and throw him over a nearby fence. When Brian attempted to grab Kwai by the arm, he missed, and Kwai began hitting Brian in the head with the metal pipe. Brian testified that

Kwai hit him four or five times in the head, causing him to stagger backwards before he eventually fell to the ground.

[¶6.]      Bernadette got out of the van and saw Kwai hitting Brian over the head with something.  When she got closer to them, she observed that Kwai was using a metal bar.  She then noticed that Kwai's vehicle was rolling forward slowly, and she ran toward it, got into the passenger seat, and tried to shut it off, but she was unable to do so because the vehicle was in gear.  The vehicle stopped moving after it hit a fence.

[¶7.]      While Bernadette was in Kwai's vehicle, Kwai entered the driver's side.  Bernadette then tried to get out quickly, but as she was doing so, she felt Kwai accelerate and she "kind of fell out" of the vehicle.  She heard Brian calling for help and then saw Kwai accelerate the vehicle backwards, running over Brian.

[¶8.]      A bystander called 911, and emergency personnel arrived at the scene.  Brian was taken to the hospital by ambulance.  He sustained a head injury requiring multiple staples to repair, nine broken ribs, a broken hip, and a fractured femur.  He was in the hospital for approximately one month and he underwent eight surgeries.  He has used a wheelchair since the incident and suffers from memory and speech issues.

[¶9.]      Kwai was charged by indictment on September 9, 2020, with the following counts: aggravated assault (extreme indifference); aggravated assault (dangerous weapon; crowbar and/or metal pipe); aggravated assault (dangerous weapon; vehicle); aggravated assault (physical menace); hit and run (injury or death); and hit and run (property damage).  The circuit court appointed counsel at

Kwai's request and from September 14, 2020 to April 2021, the court held multiple hearings related to Kwai's concerns about procedural matters and the quality of his representation by court appointed counsel. Ultimately, during a hearing on April 14, 2021, the court appointed new counsel (who is also appellate counsel) to represent Kwai.

[¶10.] A jury trial was held on August 18–20, 2021. Among other witnesses, the State presented testimony from Brian, Bernadette, and testimony from multiple law enforcement officers establishing that Kwai was the person driving the vehicle that ran over Brian. The State also offered, and the court admitted, the video footage taken near the incident from a homeowner's outside security camera. This recording was played for the jury, and it contains audio capturing the sound of a scuffle and people yelling. The video image, however, is grainy, dark, and from a vantage point of some distance. It nevertheless depicts a vehicle slowly rolling forward until it stops after the front end hits a fence. It also shows a person entering the passenger side, leaving the door open, and then exiting. Thereafter, it shows the vehicle accelerating in reverse and backing over a person in the process, then driving forward and speeding away from the scene.

[¶11.] Kwai did not testify or call any witnesses, but he moved at the close of the evidence for a judgment of acquittal. While Kwai's motion related to all counts, he presented specific arguments regarding the aggravated assault by physical menace count as well as the felony hit and run count. With respect to the latter, he asserted that the crime encompasses only accidental acts, and by presenting evidence that the driver of the vehicle involved in this incident intentionally ran

over Brian, the State failed to make a prima facie case that an accident occurred.[1] He provided the circuit court with an out-of-state case wherein the court concluded that the term "accident" in a similar hit and run statute did not apply to an intentional attempt to murder someone with a vehicle.

[¶12.]     In response, the State did not provide an alternative argument as to the meaning of the term "accident" and instead argued that it is entitled to "present alternate theories of how things happened." The State then noted the defense's view of the evidence with respect to the aggravated assault count, i.e., that Kwai "in backing up his vehicle, didn't realize [Brian] was there[;] he was just in a super hurry to leave[.]" The State further noted that because Kwai "didn't render aid upon knowing that he had, in fact, struck [Brian,]" there was evidence to support a finding of guilt on felony hit and run.

[¶13.]     In ruling on Kwai's motion, the circuit court advised that it had reviewed the case law provided by Kwai and acknowledged that the incident at hand was described during trial as an intentional act. However, the court did not adopt or reject Kwai's asserted interpretation of the statute. Instead, the court noted that "there is evidence that can support the fact that the driver of the vehicle was in a hurry and didn't necessarily intend to . . . cause the accident and then left the scene." The court denied Kwai's motion for judgment of acquittal in its entirety.

---

1.     In closing argument, defense counsel made this same argument with respect to the hit and run count to the jury, and then focused primarily on the assertion that the State failed to prove beyond a reasonable doubt that Kwai was the driver of the vehicle involved in this incident and therefore he could not be found guilty on the aggravated assault counts.

[¶14.]     The jury ultimately returned a guilty verdict on all counts. The circuit court sentenced Kwai on the aggravated assault (extreme indifference) count to fifteen years with five suspended and gave him credit for 409 days served. The court imposed a concurrent sentence of two years with two years suspended on the felony hit and run (injury or death) count. The court did not impose sentences on the remaining counts. Kwai appeals, and his appellate counsel submitted what purports to be a *Korth* brief. *See State v. Korth*, 2002 S.D. 101, 650 N.W.2d 528.

## Analysis and Decision

### *Compliance with Korth briefing procedure*

[¶15.]     In *State v. Arabie*, we noted that the *Korth* briefing procedure is used "where court appointed counsel has identified no meritorious issues for appeal[.]" 2003 S.D. 57, ¶ 9, 663 N.W.2d 250, 254. Pursuant to *Korth*, counsel is to submit a brief that contains a "Section A completed by counsel to include, among other things, a statement 'that counsel has not identified any arguably meritorious issue on appeal'" and a Section B identifying "any claims of error requested by the client." *Id.* (quoting *Korth*, 2002 S.D. 101, ¶ 16 n.6, 650 N.W.2d at 535 n.6). We also explained that counsel is not permitted to assert arguably meritorious issues in Section A.[2] Rather, "the only issues that should be presented and argued in a *Korth* brief are those issues presented at the client's request in Section B of the brief." *Id.*

---

2.     The Court in *Arabie* noted that the language in *Korth* suggested counsel could assert arguably meritorious issues in Section A. However, the Court explained that such a view is not supportable because in *Korth*, the Court had adopted Oregon's procedure and under that procedure it is "clear that counsel should not argue *any* issues in Section A of the brief." 2003 S.D. 57, ¶ 10, 663 N.W.2d at 254.

¶ 11. "[I]f there are issues in the case that counsel believes are meritorious," counsel is to "abandon the *Korth* procedure and brief and argue those issues as in any other criminal appeal." *Id.* ¶ 10.

[¶16.] Here, counsel for Kwai submitted a brief that fails to comply with the *Korth* procedure as clarified in *Arabie*. While counsel's brief contains both Sections A and B, counsel asserts in Section A an issue that he believes is arguably meritorious in addition to identifying, in Section B, Kwai's issues counsel found non-meritorious. Because Kwai's appellate counsel identified an arguably meritorious issue, counsel should have, rather than use the *Korth* briefing procedure, briefed the matter as counsel would do "in any other criminal appeal." *See id.*

[¶17.] Because both the State and counsel for Kwai have fully briefed the arguably meritorious issue, this Court may address it despite the lack of compliance with *Korth*. As this Court noted in *State v. Bousum*, when there is a properly filed *Korth* brief and we identify an arguably meritorious issue, we would ordinarily require supplemental briefing on the issue. 2003 S.D. 58, ¶ 10, 663 N.W.2d 257, 261; *see Hughbanks v. Dooley*, 2016 S.D. 76, ¶ 1, 887 N.W.2d 319, 320 (noting that on direct appeal, this Court identified two arguably meritorious issues and directed supplemental briefing). However, if the parties' briefs on appeal "are complete and supported by adequate authorities to warrant our consideration of the merits of the issues at this time[,]" there is no reason to order supplemental briefing and the Court may "proceed to consider the merits of the substantive issues presented." *Bousum*, 2003 S.D. 58, ¶ 10, 663 N.W.2d at 261.

[¶18.]    Having decided to address the arguably meritorious issue, we decline to address Kwai's non-meritorious issues in Section B. This approach has been taken by the Court in past cases wherein appellate counsel asserted an issue in Section A that counsel believes is arguably meritorious and included the defendant's non-meritorious issues in Section B. *State v. Dillon*, 2007 S.D. 77, ¶ 29, 738 N.W.2d 57, 63 (indicating it will not address the Section B issues because "it is improper procedure to include a Part B section with client issues when counsel has identified an arguably meritorious issue"); *State v. Lewis*, 2005 S.D. 111, ¶ 7 n.2, 706 N.W.2d 252, 255 n.2 (concluding that by asserting arguably meritorious issues in Section A, the Section B issues "are not properly before the Court"). Declining to address Kwai's non-meritorious issues also aligns with the notion that a defendant does not have a right to "hybrid representation" on appeal where defense counsel asserts the arguably meritorious issue and the defendant asserts, pro se, the issues counsel believes lack merit.[3] *See State v. Paulson*, 2015 S.D. 12, ¶ 7 n.1, 861 N.W.2d 504, 507 n.1 (quoting *United States v. Turner*, 677 F.3d 570, 577 (3d Cir.

---

3.    The Court took a different approach in *State v. Paulson*, 2015 S.D. 12, 861 N.W.2d 504 by reviewing only the issues identified by the defendant in Section B even though counsel raised issues he believed to have merit in Section A. A review of *Paulson*, however, reveals that it should be limited to its unique facts because in that case the defendant did not want the meritorious issues identified by counsel to be raised and instead wanted to raise only frivolous issues. *Id.* ¶ 7, 861 N.W.2d at 506–07. The Court noted that it could require counsel to refile a brief to comport with *Korth*; however, it concluded that "refiling appears redundant in this case as [the defendant] selected the only arguments he wanted to appeal and presented them in Section B of the brief." *Id.* ¶ 9 n.2, 861 N.W.2d at 507, n.2. Here, there is no indication in the record or briefing that Kwai did *not* want his appellate counsel to assert the arguably meritorious issue on appeal. Therefore, this case is more akin to *Lewis* and *Dillon*.

2012). *See also* SDCL 15-26A-70.1 (providing that when a party is represented by counsel on appeal, the Court is not to accept any pro se briefs except "pro se . . . briefs filed pursuant to State v. Korth").

***Whether SDCL 32-34-5 applies to deliberate acts***

[¶19.]     Kwai asserts that the circuit court erred in denying his motion for judgment of acquittal on the count alleging felony hit and run in violation of SDCL 32-34-5 because, in his view, the Legislature's use of the word "accident" in the statute means that it implicates only unintended occurrences, and at trial, the State argued that Kwai's actions were deliberate and presented evidence to support this theory.  Kwai notes that the word "accident" is not defined in SDCL chapter 32-34. However, he contends that we should "adopt the line of reasoning" in *State v. Liuafi*, 623 P.2d 1271, 1282 (Haw. Ct. App. 1981), that intentionally "using one's vehicle as a weapon does not fit within the general, popular, usual sense of the word 'accident.'"

[¶20.]     In response, the State claims that a conviction under SDCL 32-34-5 is not limited to unintentional acts but, rather, is intended to criminalize a driver's conduct occurring after the incident involving the vehicle.  The State directs this Court to the language in *State v. Cameron*, 1999 S.D. 70, ¶ 21, 596 N.W.2d 49, 54 that the purpose of the statute, in requiring drivers to stop and comply with SDCL 32-34-3, is to protect people injured in automobile accidents.  The State also directs this Court to a number of cases that have applied a different statutory interpretation than the one applied in the case Kwai relies on.  *See, e.g., State v. Harmon*, 723 N.W.2d 732 (Wisc. Ct. App. 2006); *State v. Silva*, 24 P.3d 477 (Wash.

Ct. App. 2001); *Gutierrez v. State*, 510 S.E.2d 570 (Ga. Ct. App. 1998); *State v. Rodgers*, 909 P.2d 445 (Ariz. Ct. App. 1995); *McGee v. State*, 815 P.2d 196 (Okla. Crim. App. 1991); *People v. Martinson*, 409 N.W.2d 754 (Mich. Ct. App. 1987); *State v. Smyth*, 397 A.2d 497 (R.I. 1979); *State v. Westmoreland*, 807 S.E.2d 701 (S.C. Ct. App. 2017).

[¶21.] "[A] motion for judgment of acquittal attacks the sufficiency of the evidence, which is a question of law whether the motion is considered before or after the jury's verdict." *State v. Wolf*, 2020 S.D. 15, ¶ 12, 941 N.W.2d 216, 220. "A question regarding the sufficiency of the evidence to sustain a conviction is reviewed de novo." *State v. McReynolds*, 2020 S.D. 65, ¶ 11, 951 N.W.2d 809, 814. Questions of statutory interpretation are also reviewed de novo. *Cameron*, 1999 S.D. 70, ¶ 7, 596 N.W.2d at 51. "The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute." *Id.* ¶ 17, 596 N.W.2d at 53 (citation omitted).

[¶22.] SDCL 32-34-5 provides that "[a]ny driver of any vehicle involved in an *accident* resulting in injury or death to any person, who fails immediately to stop such vehicle at the scene of such accident and comply with the provisions of § 32-34-3 is guilty of a Class 6 felony[.]" (Emphasis added.) Also relevant, SDCL 32-34-3 provides that "[t]he driver of any vehicle involved in any *accident* resulting in injury or death to any person or damage to property shall immediately stop and give his name and address, and the name and address of the owner and the license number of the vehicle he is driving to the person struck or the driver or occupants of any vehicle collided with and shall render to any person injured in such accident

reasonable assistance, including the carrying of such person to a physician or surgeon for medical treatment if it is apparent that such treatment is necessary or is requested by the injured person." (Emphasis added.)

[¶23.] The word "accident" is not defined in SDCL chapter 32-34. However, in *Cameron*, this Court looked to dictionary definitions in concluding that the word "accident" as used in SDCL 32-34-5 "necessarily includes single-vehicle accidents." 1999 S.D. 70, ¶¶ 18, 21, 596 N.W.2d at 53–54. From one definition, the Court noted that the word means "a 'sudden event or change occurring without intent or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result.'" *Id.* ¶ 18, 596 N.W.2d at 53 (quoting Webster's New International Dictionary 11 (1976)). From Black's Law Dictionary, the Court related the "popular sense" of the word as:

> [A] fortuitous circumstance, event, or happening; an event happening without any human agency, or if happening wholly or partly through human agency, an *event which under the circumstances is unusual and unexpected by the person to whom it happens*; an unusual, fortuitous, unexpected, unforeseen or unlooked for event, happening or occurrence; an unusual or unexpected result attending the operation or performance of a usual or necessary act or event; chance or contingency; fortune; mishap[.]

*Id.* (emphasis added) (alterations in original) (quoting Black's Law Dictionary 15 (6th ed. 1990)).

[¶24.] In a more recent edition of Black's Law Dictionary, "accident" is defined in one sense as "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or *that could not be reasonably anticipated; any unwanted or harmful event occurring suddenly*, as a

collision, spill, fall, or the like, irrespective of cause or blame." Black's Law Dictionary (11th ed. 2019) (emphasis added). In another sense, "accident" is "[a]n unforeseen and injurious occurrence not attributable *to the victim's* mistake, negligence, neglect, or misconduct; *an unanticipated and untoward event that causes harm.*" *Id.* (emphasis added). Black's Law Dictionary more specifically defines "car accident," "motor-vehicle accident," and "traffic accident" as "[a]n accident in which a motor vehicle collides with another vehicle or with a person, animal, or object, usu[ally] causing damage or injury." *Id.*

[¶25.] Although it is apparent from the dictionary definitions in *Cameron* and those cited above that the word "accident" has more than one ordinary and common meaning, it is also apparent from these sources that there are definitions supporting an interpretation that when the incident is considered from the perspective of the person unexpectedly injured, an accident has occurred regardless of the state of mind of the involved driver. The pertinent question, however, is whether the Legislature intended by its use of the word "accident" in SDCL 32-34-5 to exclude incidents wherein a driver intentionally causes injury or death. In answering this question, we are guided by SDCL 22-1-1, a statute that requires us to interpret penal statutes "according to the fair import of their terms, *with a view to effect their objects* and promote justice." *See Cameron*, 1999 S.D. 70, ¶ 20, 596 N.W.2d at 54 (emphasis added) (quoting SDCL 22-1-1). As the Court has noted, SDCL 22-1-1 abrogated the common law rule that "that penal statutes are to be strictly construed[.]" *See State v. Bad Heart Bull*, 257 N.W.2d 715, 719 (S.D. 1977).

[¶26.]     Long ago, this Court identified that the "manifest purpose" of the requirement to stop the vehicle at the scene of the accident "is to prevent drivers from seeking to evade prosecution by escaping before their identity can be determined." *State v. Clark*, 67 S.D. 133, 290 N.W. 237, 239 (1940). Then in *Cameron*, the Court noted another purpose: "to protect persons injured in automobile accidents by having the drivers of such vehicles render reasonable assistance to injured persons." 1999 S.D. 70, ¶ 21, 596 N.W.2d at 54. More recently, the Court in *State v. Nekolite*, observed that punishment under SDCL 32-34-5 is not "directly for inflicting damage or injury, but rather for the failure to stop and comply with the requirements of SDCL 32-34-3." 2020 S.D. 8, ¶ 21, 939 N.W.2d 850, 854.

[¶27.]     With these purposes in mind, an interpretation of the word "accident" to exclude intentional conduct on the part of the driver fails to comport with the penal nature of SDCL 32-34-5. In fact, there is nothing in the language of SDCL 32-34-5 or chapter 32-34 as a whole that suggests the Legislature intended the nature of the triggering vehicular incident—whether occurring by chance, negligence, criminal conduct, or intentional conduct—to be a relevant consideration for a conviction. On the contrary, as multiple other courts have similarly concluded, the conduct our hit and run statute seeks to punish is the failure to stop and comply with SDCL 32-34-3.[4]

---

4.    Secondary sources have recognized the majority view that "[t]he term 'accident,' as used in a state's hit-and-run statute, includes both intentional and unintentional collisions; the purpose of the statute is to protect persons injured as the result of, and to ensure the assessment of liability arising out

(continued . . .)

[¶28.] For example, the Rhode Island Supreme Court, after noting that the term "accident" has varying definitions, concluded that the hit and run statute "is unconcerned with the cause of the accident be it by act of God, by negligent conduct, by wilful or wanton conduct, or by intentional act" because the purpose of the "statute is to protect by its aid provision persons injured on the highway and to assure by its disclosure provisions that financial responsibility for the accident can be fairly assessed." *Smyth*, 397 A.2d at 499. For the same reason, the court determined that the hit and run statute's reporting mandates should not "depend on the mental state of the actor involved in a vehicular collision." *Id.*; *accord State v. Sabetta*, 672 A.2d 451, 452 (R.I. 1996) (declining to reexamine *Smyth's* holding).

[¶29.] Relying on the rationale in *Smyth*, the Supreme Court of Virginia also concluded that "it makes no difference whether the collision was intentional or unintentional." *Milazzo v. Commonwealth*, 668 S.E.2d 158, 160 (Va. 2008). The court relied on the purpose of Virginia's hit and run statute "to protect persons injured as the result of, and to ensure the assessment of liability arising out of, an unfortunate vehicular event." *Id.* A Wisconsin appellate court reached the same result because it would be unreasonable "to conclude that the legislature intended to limit 'accident' to incidents that occurred through the 'lack of intention' of the operator of the motor vehicle[.]" *Harmon*, 723 N.W.2d at 737. The court also noted

_____

(. . . continued)

> of, an unfortunate vehicular event." 7A Am. Jur. 2nd *Automobiles* § 327 (May 2023); *accord* 61A C.J.S. Motor Vehicles § 1694 (May 2023) (noting that "[i]n general, it does not matter whether the person accused caused the injury or collision by a culpable or intentional act or whether it occurred through pure accident").

that "[l]imiting the meaning of the word 'accident' to unintentional conduct significantly undermines the purposes of the statute[.]" *Id.*

[¶30.] Although not directly on point because the driver did not intentionally cause the resulting injury, the Arizona court's decision in *Rodgers* is instructive. 909 P.2d at 447. In that case, "the victim *deliberately* jumped from [the defendant's] car," and the defendant argued on appeal that because the injury did not result from an *accident*, the defendant's failure to remain at the scene did not violate the state's hit and run statute. *Id.* at 447. The Arizona court noted that the word "'accident' has more than one 'common' usage." *Id.* However, because of the court's obligation to "adopt the meaning that is most in keeping with the legislative purpose behind the statute, examining the evil it seeks to remedy[,]" the court read "accident" "to include any vehicular incident resulting in injury or death, whether or not such harm was intended." *Id.* The court determined that to conclude otherwise "would result in consequences totally contradictory to the statute's goal of determining culpability" because "drivers who *intentionally* commit criminal acts with their vehicles would not be legally obligated to stop, identify themselves, and render aid[.]" *Id.*

[¶31.] The court in *Silva* also determined that a narrow reading of the word "accident" in a hit and run statute "would frustrate the Legislature's intent to prevent drivers from escaping liability for their acts and to provide immediate help for those injured." 24 P.3d at 481. It "would lead to the absurd result that a person could intentionally injure another person with a car and drive away 'without fear of violating the statute.'" *Id.* The court in *People v. Jiminez* similarly explained, "[a]

construction of the statute which would excuse those drivers who intended to cause an injury-producing occurrence from a duty imposed on all other involved drivers would produce the absurd result that drivers with the highest level of fault for the injury-producing occurrence could shirk their responsibilities with impunity while those drivers who were merely negligent or without fault were burdened with the statute's requirements."  15 Cal. Rptr. 2d 268, 275–76 (Cal. Ct. App. 1992); *see also McGee*, 815 P.2d at 198 ("It makes no sense to read the statute as imposing duties on persons who negligently injure others or damage their property but as absolving persons who do so intentionally from any such duties." (citation omitted)).

[¶32.]     Notably, although the case Kwai relies on, *Liuafi*, 623 P.2d at 1282–83, concluded that Hawaii's hit and run statute does not apply to "[a]n intentional attempt to murder a person by using one's vehicle as a weapon[,]" it appears the Hawaii court limited its holding to the facts at issue.  The court did not issue a broad ruling regarding the meaning of "accident"; rather, it concluded simply that "accident" "excludes the event that occurred in this case" and, in a footnote, indicated that it was "unnecessary to [the court's] task in this case" to define "accident."  *See id.* at 1282 n.6.  Nevertheless, even if the Hawaii court intended its holding in *Liuafi* to apply to all vehicular incidents arising from intentional conduct, the case reflects a minority view and, in fact, has been distinguished and rejected by multiple courts.[5]  *See, e.g.*, *People v. Varela*, B293471, 2020 WL 6111649,

---

5.     Aside from *Liuafi*, we have only found one case that reached the same result.  *See Gill v. Commonwealth*, 465 S.W.3d 35 (Ky. Ct. App. 2015).  And a review of *Gill* reveals that it, like *Luiafi*, did not consider the purpose of the hit and run statute in light of the varying definitions of the word "accident."

at *3 (Cal. Ct. App. October 16, 2020); *State v. Parker*, 689 P.2d 1035, 1037–38 (Or. Ct. App. 1984); *Harmon*, 723 N.W.2d at 737.

[¶33.]     To conclude that SDCL 32-34-5 only applies when the driver of the vehicle does not intend injury or death, as Kwai asserts, would mean that "a person could by design maim another person with a car and drive off, without fear of violating this statute." *See Gutierrez*, 510 S.E.2d at 574.  Such an interpretation contravenes "the statute's intent." *See Nekolite*, 2020 S.D. 8, ¶ 24, 939 N.W.2d at 855 (concluding that requiring knowledge of the injury as an element of the offense would allow fleeing motorists to avoid felony-grade punishment when "our statutes merely seek compliance with minimum standards for sharing information and rendering aid, if necessary").  As one court explained, "[s]topping is required regardless of the intent of the driver in causing the harm[,]" and thus, "[w]hether the collision was intended or not is not an element of the crime." *Gutierrez*, 510 S.E.2d at 574.

[¶34.]     Because the purpose of SDCL 32-34-5 is to punish defendants for their failure to stop and comply with the requirements of SDCL 32-34-3, and definitional sources, including those quoted in *Cameron*, contemplate an event that is unusual, unexpected, or unforeseen by the person to whom it happens, SDCL 32-34-5 applies regardless of whether the defendant's acts were intentional.  Kwai offers no additional arguments in support of his claim that the evidence was insufficient to support his conviction under SDCL 32-34-5; therefore, we affirm the circuit court's denial of Kwai's motion for judgment of acquittal on this count.

[¶35.]     Affirmed.

[¶36.] JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.